L39QmosC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        21 CR 00092 (AJN)
                                         Remote Skype Conference
5    YURY MOSHA, ULADZIMIR DANSKOI,
     JULIA GREENBERG and
6    ALEKSEI KMIT

7              Defendants.

8    ------------------------------x

9                                        New York, N.Y.
                                         March 9, 2021
10                                       12:00 p.m.

11
     Before:
12
                         HON. ALISON J. NATHAN,
13
                                         District Judge
14

15                       APPEARANCES

16   AUDREY STRAUSS
          United States Attorney for the
17        Southern District of New York
     JONATHAN REBOLD
18   DAVID R. FELTON
          Assistant United States Attorney
19

20   LAW OFFICE OF VADIM A. GLOZMAN
          Attorney for Defendant Mosha
21   VADIM A. GLOZMAN

22   SHARIFOV and ASSOCIATES PLLC
          Attorney for Defendant Danskoi
23   ROVSHAN C. SHARIFOV

24

25

1   APPEARANCES CONTINUED:

2   SHAROVA LAW FIRM
         Attorney for Defendant Greenberg
3   CHARLES W. KASER

4

5   STEPHEN TURANO
         Attorney for Defendant Kmit

6

7   ALSO PRESENT:   RUSSELL LAMPIER, FBI
                    YANA AGOUREV, Interpreter (Russian)
8                   JOSHUA ROTHMAN, USPS (SDNY)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (The Judge and all parties appearing via Skype)

2           THE COURT:  Ms. Williams, please call the case.

3           DEPUTY CLERK:  In the case of United States against

4    Mosha, et al., 21 CR 92.  This is a reminder that this is a

5    public proceeding.  Members of the public and press are able to

6    access the proceeding with a public dial-in number.  All

7    participants are reminded that any recording or rebroadcasting

8    of this proceeding is strictly prohibited.

9           Counsel, please state your name for the record

10   starting with the government.

11          MR. REBOLD:  Good morning, Judge Nathan.  This is

12   Jonathan Rebold for the government.  I'm also joined by David

13   Felton, who is also with my office, and I understand that

14   Special Agent Russell Lampier with the Federal Bureau of

15   Investigation is also on this call.  And good morning also to

16   Mr. Glozman.

17          THE COURT:  Good morning everyone.  Let me take

18   appearances of counsel beginning with counsel for Mr. Mosha.

19          MR. GLOZMAN:  Good morning, your Honor.  Vadim Glozman

20   on behalf of Mr. Mosha, who is present on Skype, and you can

21   see him in the video.

22          THE COURT:  Good morning to you both.

23          And on behalf of defendant Danskoi.

24          MR. SHARIFOV:  Good morning, your Honor.  Rovshan

25   Sharifov, counsel for Mr. Danskoi, who is also present on Skype

next to me in my office.  I don't know if you can see him, your

Honor.

THE COURT:  I can.  Thank you.  It's tipped over into

afternoon.  Good afternoon to you both.

And counsel for Ms. Greenberg.

MR. KASER:  Yes.  Good morning-afternoon, your Honor.

I'm not sure which way the clock is going.  I'm here for

Ms. Greenberg.  I'm not sure if her camera is on.  I can't see

everyone.  I can just see you right now.

THE COURT:  Good morning to you, Mr. Kaser.  And

Ms. Greenberg, I have a block for you, but I don't see you.

Are you able to see and hear me OK?

DEFENDANT GREENBERG:  I do see and hear you, your

Honor.

THE COURT:  Thank you.  Good morning to you.

And for defendant Kmit.

MR. TURANO:  Good afternoon, your Honor.  Stephen

Turano on behalf of Aleksei Kmit, who I know is participating

by telephone line.  I don't know if he is on Skype.

THE COURT:  Mr. Kmit, are you able to hear me?

Ms. Williams?

DEPUTY CLERK:  Yes, Judge, I'm here.

THE COURT:  We don't seem to have at least the

interpreter for Mr. Kmit.  I'm not hearing any response.

DEPUTY CLERK:  It should be Ms. Yana.  She is on the

1    line.  I see her on the line.  Her number is appearing.

2         Ms. Yana?

3         THE INTERPRETER:  Your Honor, this is Yana Agoureev,

4    the Russian Interpreter.  I do not have Mr. Kmit on my

5    interpretation line.  I just have Mr. Mosha.

6         THE COURT:  OK.  So, Ms. Williams, we don't have all

7    the defendants.

8         DEPUTY CLERK:  Hold on, please.

9         THE COURT:  What I'm going to suggest is that we

10   proceed with the other defendants since everybody has been at

11   this a long time, and despite being a year into the pandemic,

12   we continue to have these difficulties.  So my suggestion is

13   that we proceed with who we have, and I will have a separate

14   proceeding with Mr. Kmit.

15        Let me just confirm.  So counsel for Mr. Kmit is

16   Mr. Turano, who I do have.  Mr. Turano, is that acceptable?

17        MR. TURANO:  Yes, your Honor.  And I have

18   independently communicated with my client by text, and he must

19   have gotten knocked off.  He said he is going to try calling

20   back.

21        THE COURT:  We will try that.  If that fails, we will

22   proceed with the other defendants.

23        MR. TURANO:  All right.  I think he's indicated he's

24   on now, by the way.

25        THE COURT:  Mr. Kmit, are you in touch with the

1   interpreter?

2        THE INTERPRETER:  Your Honor, this is the Russian

3   interpreter, and I have Mr. Mosha and Mr. Donskoi on the

4   interpretation line, but I do not have Mr. Kmit.

5        THE COURT:  All right.  Then, Mr. Turano, let me work

6   with the other defendants, and we will move -- we will work

7   with you and Mr. Kmit immediately afterwards, but I think we

8   should proceed, and you're welcome to stay and leave to speak

9   to him as you need to do, Mr. Turano.

10       MR. TURANO:  Thank you, your Honor.

11       THE COURT:  Thank you.

12       And our Russian interpreter, could I ask you to please

13   put your name on the record?

14       THE INTERPRETER:  Yana Agoureev.

15       THE COURT:  Thank you, Ms. Agoureev.

16       We have our court reporter on the line?

17       (Replies)

18       THE COURT:  Good afternoon, Alena.  Thank you very

19   much.  Sorry for the delay.

20       I am Judge Nathan.  I am the District Court Judge who

21   will be handling this matter going forward.  A few preliminary

22   matters.  We are in the middle of the COVID-19 pandemic, so I

23   am attempting to conduct this proceeding remotely pursuant to

24   the authority provided by Section 15002 of the CARES Act and

25   the standing orders issued by our Chief Judge pursuant to that

Act.  We are trying to proceed by videoconference using the

Skype for Business platform.  We do have a Russian language

interpreter on separate audio lines with the defendants so that

she can interpret simultaneously for them in addition to the

Skype video connection.

I am going to ask each of the defendants if they can

see me, hear me and understand -- hear the interpreter and

understand the interpreter.

So, beginning with Mr. Mosha, are you able to see and

hear and understand the interpretation?

DEFENDANT MOSHA:  Yes, I do.

THE COURT:  Thank you.

Mr. Danskoi, same question.

DEFENDANT DANSKOI:  Yes, I can hear, see and

understand well.

THE COURT:  Terrific.  Thank you.

And, obviously, Ms. Greenberg, you don't need an

interpreter, and we don't have Mr. Kmit.  Unless, Mr. Kmit,

have you joined?  No.  OK, so we will proceed as indicated.

But let me ask Ms. Greenberg, are you able to see and

hear me OK?

DEFENDANT GREENBERG:  Yes, your Honor.

THE COURT:  Thank you.

For all of the defendants, if at any point during the

proceeding you run into any difficulty with the video or the

1   audio or the interpretation, let me know right away.  We will

2   stop and address that before proceeding any further.

3           I'm going to talk about waiver of physical appearance

4   forms and that process.  We will begin with Mr. Mosha's

5   counsel, and that is Mr. Glozman?

6           MR. GLOZMAN:  Yes, your Honor.

7           THE COURT:  Mr. Glozman, can you talk about the

8   process by which you discussed the issue of the right to be

9   present for this proceeding with Mr. Mosha, his signature on

10  the waiver of physical presence form -- which we did receive,

11  thank you -- and whether he continues to waive his right to be

12  physically present today.

13          MR. GLOZMAN:  Yes, your Honor, I've discussed the

14  issues surrounding the pandemic and the ability to conduct

15  in-person hearings.  I've explained to Mr. Mosha he has the

16  right to waive the in-person appearance and sign the waiver

17  form, which I explained to him.  He consents to proceeding by

18  video and by telephone for purposes of safety efficiency.  And

19  that is his true and accurate signature on the waiver forms.

20          THE COURT:  Thank you, Mr. Glozman.

21          And, Mr. Mosha, is what your attorney stated an

22  accurate representation of your understanding of the issue and

23  your willingness to proceed remotely today by waiving physical

24  presence?

25          DEFENDANT MOSHA:  Yes.

1          THE COURT:  Great.  Thank you.

2          Turning to counsel for Mr. Danskoi, that's

3    Mr. Sharifov.

4          MR. SHARIFOV:  Yes, your Honor.

5          THE COURT:  Mr. Sharifov, same questions.  Could you

6    describe the opportunity to discuss the issue with your client?

7          MR. SHARIFOV:  Sure, Judge.  I discussed with my

8    client the waiver of right to be present at the criminal

9    proceedings in person and over the phone, and he understood and

10   waived it.  He continues to waive that, and he's here present,

11   Judge, also to discuss today as well.

12         THE COURT:  Thank you, Mr. Sharifov.

13         Mr. Danskoi, is what your attorney stated an accurate

14   description of your understanding and your wish to waive your

15   right to be physically present?

16         DEFENDANT DANSKOI:  Yes.  My attorney actually

17   explained to me that I have a constitutional right to attend an

18   in-person hearing, but because of COVID-19, I waived that

19   right, and I signed my waiver and consent form.

20         THE COURT:  Thank you very much.

21         And the attorney for Ms. Greenberg, Mr. Kaser, same

22   question.

23         MR. KASER:  Yes.  Thank you, your Honor.

24         I did speak to my client about her constitutional

25   right to appear in person.  She is aware that she can waive

1    that right due to safety concerns of the pandemic, and she did.

2    That is her signature on the document, it's an electronic

3    signature, so she is waiving her right to appear.

4              THE COURT:  Thank you.

5              Ms. Greenberg, is that accurate?

6              DEFENDANT GREENBERG:  That's accurate, your Honor.

7              THE COURT:  I just note, I do need to do a presentment

8    today, Ms. Greenberg, informing you of your rights.  In

9    addition to the arraignment and conference waiver, do you also

10   waive your right to be physically present for the presentment

11   today?

12             DEFENDANT GREENBERG:  So waived, your Honor.

13             THE COURT:  Say it again?

14             DEFENDANT GREENBERG:  So waived.  I do waive it.

15             THE COURT:  Thank you so much.

16             So, with that, counsel, I am prepared to find that the

17   three defendants that I've just conversed with knowingly and

18   voluntarily waive the right to be physically present for

19   today's proceeding.  I am also prepared to find that today's

20   proceeding cannot be further delayed without serious harm to

21   the interest of justice because both in the individual case and

22   in the aggregate we must keep our criminal cases moving forward

23   despite the prolonged safety issues presented by the pandemic.

24   New cases coming in need to have an opportunity for the

25   defendants and counsel to meet with me, to get discovery

1  produced, to get a schedule for the case and to keep cases

2  moving forward in order to effectuate defendants' speedy trial

3  rights.

4        So let me just ask if there are any objections to

5  those anticipated findings.  Mr. Glozman?

6        MR. GLOZMAN:  No objections, your Honor.

7        THE COURT:  Mr. Sharifov?

8        MR. SHARIFOV:  No objection, your Honor.

9        THE COURT:  Mr. Kaser?

10        MR. KASER:  I don't have any objection.  However, I

11  think when we select a trial date, I'm inclined to ask you to

12  put my two cents in.

13        THE COURT:  Yes.  No, I'm just talking about --

14        MR. KASER:  I just didn't want to surprise anyone.

15        THE COURT:  I understand.  Let me just ask.  I see

16  you, Mr. Turano.  Give me one moment.

17        Mr. Rebold?

18        MR. REBOLD:  Yes, your Honor, we have no objection.

19        THE COURT:  I do make those findings.

20        Mr. Turano, I see you raising your hand.

21        MR. TURANO:  Your Honor, I think Mr. Kmit is on with

22  the interpreter, at least that's what he's texted me.  He has

23  heard the whole proceeding all along so we can pick up there if

24  that's the case.

25        THE COURT:  OK.  Mr. Kmit, are you able to hear the

1 proceeding now?

2          MR. KMIT:  Yes, I'm here.  I can hear everything.

3          THE COURT:  Very well, and you have been able to hear

4 what I just discussed with the other defendants regarding

5 waiver of their right to be physically present?

6          THE INTERPRETER:  Your Honor, this is the interpreter.

7 I think Mr. Kmit is on the main line, and he is expecting

8 interpretation on the main line.

9          MR. TURANO:  Judge, I've given him the line.  I will

10 just step back and communicate with him then.  I don't know

11 why.  OK.

12          THE COURT:  We will continue to proceed with the three

13 defendants, and, Mr. Turano, I will pick up with you and

14 Mr. Kmit at the end.

15          MR. TURANO:  Yes, Judge.

16          THE COURT:  With those findings in place, we can

17 proceed to the next preliminary matter, which is largely

18 addressed to Mr. Rebold.

19          Pursuant to Federal Rules of Criminal Procedure 5(f),

20 I remind the prosecution of its obligation under *Brady v.*

21 *Maryland* and related cases to disclose to the defense all

22 information, whether admissible or not, that is favorable to

23 the defendant, material either to guilt or to punishment and

24 known to the prosecution.

25          The prosecution must make good faith efforts to

1  disclose such information to the defense as soon as reasonably

2  possible.  Failure to do so may result in any number of

3  consequences, including a continuance, sanctions, dismissal or

4  a vacatur of conviction.  I will enter a written order

5  describing more fully these obligations and the possible

6  consequences of failing to meet them, and I do direct the

7  prosecution to review and comply with that order.

8          Mr. Rebold, can you confirm that you understand your

9  obligations and will fulfill them in this case?

10         MR. REBOLD:  Yes, your Honor, we both understand our

11  obligations, and we will fulfill them.

12         THE COURT:  Thank you.  I am going to turn now,

13  Ms. Greenberg, to the presentment of your advice of rights.

14  It's important for me to advise you of these rights at your

15  first proceeding in the district.

16         You have the right to remain silent.  You're not

17  required to make any statements.  Anything that you do or say

18  can be used against you.  Even if you've made any statements to

19  the authorities, you need not make any further statements.  Do

20  you understand these rights, Ms. Greenberg?

21         DEFENDANT GREENBERG:  Yes, your Honor.

22         THE COURT:  You have the right to be represented by

23  counsel during this court proceeding, any future court

24  proceedings, and any time you're questioned by authorities.  If

25  you can't afford an attorney, I will appoint an attorney to

1  represent you.  Do you understand these rights?

2          DEFENDANT GREENBERG:  Yes, your Honor.

3          THE COURT:  Thank you.  We will turn to the

4  arraignment next.  I am going to ask counsel for each of the

5  defendants to indicate, and we'll begin with Mr. Glozman on

6  behalf of Mr. Mosha.

7          Mr. Glozman, has your client received a copy of the

8  indictment?

9          MR. GLOZMAN:  Yes, your Honor, he's received a copy of

10 the indictment.  I've gone over it in the Russian language, so

11 he understood it and will waive a formal reading and enter a

12 plea of not guilty.

13         THE COURT:  Thank you.  I will enter a plea of not

14 guilty on behalf of Mr. Mosha.

15         Mr. Sharifov, same questions.

16         MR. SHARIFOV:  Yes, your Honor, I did give a copy of

17 the indictment to my client, Mr. Danskoi, and I pled -- I will

18 knot not guilty on his behalf and will waive the reading.

19         THE COURT:  Thank you.  Not guilty on behalf of

20 Mr. Danskoi.

21         Mr. Kaser.

22         MR. KASER:  Yes.  Thank you, Judge.  My client has a

23 received a copy of the indictment.  We waive a public reading

24 and enter a plea of not guilty.

25         THE COURT:  All right.  A plea of not guilty will be

1    entered on behalf of Ms. Greenberg.

2          With that, we turn to the scheduling proceeding, and I

3    do thank counsel for meeting in advance and trying to come to

4    agreement on a schedule.

5          Actually, before we turn to the specifics of that,

6    Mr. Rebold, I will ask you to give a brief summary of the

7    charges and describe the categories of discovery that will be

8    produced in the case.  Let's begin there, please.

9          MR. REBOLD:  Yes, your Honor.

10          So the case involves an investigation into both a

11    conspiracy to commit immigration fraud and a conspiracy to

12    defraud the United States of America.  It focuses primarily on

13    the commission of asylum fraud, at least at this stage,

14    although there are additional legs to the investigation that I

15    can touch on briefly, your Honor.

16          Based on information that a company called Russian

17    America, which was led by defendants Yury Mosha and Uladzimir

18    Danskoi, who respectively headed offices in Manhattan and

19    Brooklyn.  Based on information that those individuals and that

20    company was engaged in asylum fraud, among other things, three

21    different confidential sources working with the government and

22    at the direction of the FBI at the direction of Department of

23    Homeland Security engaged in a series of recorded in-person

24    meetings, telephonic communications, emails and other

25    communications through such messaging applications as What's

1   App with each of the charged defendants to investigate the

2   veracity of these claims of immigration fraud.

3           Among other things, Russian America and its

4   associates, including the individuals charged in this case,

5   knowingly and willfully helped the sources attempt to and in

6   some cases push through applications for asylum based on

7   fraudulent bases.  As laid out in the indictment, a pair of

8   confidential sources met at the Manhattan office which was

9   headed by Yury Mosha, and Mr. Mosha suggested, among other

10  things, that these individuals seek asylum by speaking out --

11  by creating blogs that were critical of their native government

12  as a basis to later argue that it would be unsafe to return to

13  their home countries.

14          By way of background, Russian America primarily serves

15  natives of Russia and the commonwealth of the independent

16  states, such as Ukraine and Uzbekistan, which are relevant for

17  the indictment.

18          So, Mr. Mosha and others at the Russian America

19  Manhattan office advised these sources to create logs that were

20  critical of their home government so that they could argue that

21  it was unsafe to return to those governments.  They did so

22  understanding that these sources had lacked the technical

23  ability to maintain blogs, the journalistic ability, lacked the

24  political knowledge and other topical knowledge to do this,

25  and, among other things, Mr. Mosha and others, such as Alexsei

1  Kmit, who worked as a paralegal at Russian America put these

2  sources in touch with defendant Tymur Shcherbyna, who is at

3  large we believe in Ukraine which does not extradite, so that

4  Shcherbyna could ghost write blogs on behalf of these sources.

5  And it was clear from the investigation that this was not the

6  first time that Mr. Shcherbyna did this on behalf of Russian

7  America clients.  Thereafter, Shcherbyna agreed for both

8  sources to establish and begin maintaining blogs that were

9  critical of the sources' respective purported home governments

10 of Ukraine and, I believe, Uzbekistan.

11        In the meantime, Mr. Mosha put the sources in touch

12 with Kateryna Lysyuchenko, who is a Ukrainian national based in

13 Italy to help these individuals craft asylum affidavits, which

14 are personal statements that are optional but traditionally

15 appended to individuals' Form I589 asylum applications and are

16 usually there to provide a purported personal history, history

17 of persecution and basis for asylum.

18        Ms. Lysyuchenko, among other things, with the first

19 source at least, provided him with multiple templates of other

20 people's asylum affidavits, sort of an insert-your-name-here

21 type template with various claims of persecution, including for

22 people who wrote blogs critical of their government so that

23 they could be used -- these templates could be used to craft an

24 asylum affidavit that fit that applicant.

25        Ms. Lysyuchenko and attorneys with Russian America

1    also advised the first source on ways to change -- the source

2    needed to change his affidavit so that it alleged persecution

3    where it did not actually exist.  And over the course of the

4    investigation, the source's draft application and affidavit

5    changed materially in a number of ways going from claims that

6    he was never persecuted in his own country to alleging things

7    like being beaten to the point of unconsciousness in his own

8    country based on his nationality.

9             Mr. Mosha also put that source in touch with Julia

10   Greenberg to represent the source during his asylum interview

11   with a United States Citizenship and Immigration Services, or

12   USCIS, asylum officer.  Ms. Greenberg was explicitly made aware

13   in recorded conversations that CS-1 had never been persecuted

14   in his home country; that CS-1 did not write his own blog; that

15   it was ghost written; that CS-1 only agreed with Mosha to write

16   a blog as a basis to seek asylum, not because he had any

17   independent motivation to do so; and Ms. Greenberg and others

18   prepared CS-1, the first source, to lie under oath at his

19   proceeding.  She represented him at his asylum proceeding, and

20   when an asylum officer expressed doubt about the veracity of

21   the source's claims of historical persecution, Ms. Greenberg,

22   knowing that he was never actually assaulted in Ukraine, cited

23   that instance as an example of past persecution warranting

24   asylum.

25             The investigation also involved another source who

worked with Uladzimir Danskoi, who ran the Brooklyn office of

Brooklyn of Russian America.  That individual discussed various

ways in which they could fabricate a claim of asylum, with

Mr. Danskoi understanding that the source had no actual

legitimate basis to seek asylum.  And after, Danskoi suggested

a number of ways to seek asylum, including by nationality,

persecution based on nationality, Mr. Danskoi knowingly agreed

to help the source instead falsely claim that he was a gay male

who would be persecuted if he returned to his home country of

Ukraine.

Mr. Danskoi made a number of incriminating statements

on recorded conversations about ways in which to frame the

narrative, especially since he understood the source didn't

actually have historical corroboration or a claim of

persecution in his home country.

Mr. Danskoi also put that source in touch with

Kateryna Lysyuchenko, who knowingly helped him prepare an

asylum affidavit understanding the source was actually a

heterosexual male but was seeking asylum based on the false

grounds he was a gay male who was persecuted and viciously and

sexually assaulted and physically assaulted in Ukraine with the

understanding that was not true.

And Mr. Danskoi put that source in touch with Julia

Greenberg, who during a series of recorded meetings and

conversations was explicitly apprized that the source was not a

gay male. She recognized he was not a gay male. She pushed

off his immigration proceedings, among other things, to help

him prepare to further the lie that he was a gay male who had

been persecuted in Ukraine. Among other things, in addition to

coaching that source to lie under oath in a proceeding with

USCIS asylum officer, she also instructed that source to dress

and present himself in ways that in her estimation would make

him more plausibly appear to be a gay male. For example, by

having his -- getting a manicure, having his eyebrows plucked

and instructing him to wear specific articles of clothing that

the source was otherwise not wearing in her presence.

So, based on that and an ongoing investigation, which

also, among other things, entails Russian America assisting

individuals to come into the United States -- individuals who

do not qualify for asylum to come into the United States

illegally through Mexico to claim asylum. The government's

investigation is based on, among other things, recorded

conversations between sources and the defendants who are

charged in this case and other uncharged coconspirators and

other individuals who worked with Russian America who may or

may not have been coconspirators, draft transcripts of those

meetings, search warrants of electronic devices and their

contents, searches of devices pursuant to the consent of

certain defendants, reports by the FBI, by the Department of

Homeland Security and USCIS, among other things.

1          I hope that wasn't too many granular for your Honor,

2    and I am, of course, available to answer additional questions

3    if you have any other questions about the investigation or the

4    discovery.

5          THE COURT:  Definitely the most detail I've ever

6    gotten in asking for a summary of the charges.

7          MR. REBOLD:  Your Honor, I apologize.  I anticipate

8    that there is going to be a bail application from

9    Ms. Greenberg, and so I thought it might be helpful to cabin

10   the factual background into this explanation as well so we

11   don't run through that again later.

12         THE COURT:  Any post arrest statements, Mr. Rebold?

13         MR. REBOLD:  My understanding is that there were post

14   arrest statements by -- to one effect or another by several of

15   the defendants, and we will, of course, make those available to

16   the defendants in very short order.

17         THE COURT:  In the other discovery that you've

18   described, the recorded conversations, draft transcripts of

19   those, those are in translation?

20         MR. REBOLD:  Yes.  So the recordings are, I believe,

21   all in Russian.  I want to give the caveat that some may be in

22   Ukrainian, but I believe they are all in Russian, and many of

23   the translations -- we have already received a number of draft

24   translations -- some verbatim translations; some summary

25   translations that are in English.  So we will be providing in

the next 24 to 48 hours draft translation stipulations to defense counsel so that we can begin providing the draft English translations to counsel.

THE COURT:  What is, to the extent to which you can estimate, the volume of recorded conversations?

MR. REBOLD:  Several dozen recorded conversations, but I don't have ready for your Honor an exact total length or number of gigabytes, you know, in terms of raw data.

THE COURT:  But several dozen, so not an insignificant number, but what it is, several dozen.

MR. REBOLD:  That is my best estimate, your Honor.  It may be less than that, but I think it's certainly not -- we're not talking about hundreds or anything like that.

THE COURT:  OK.  And then what's the volume of -- so you've got search warrants on electronic devices.  You have the returns on the -- you have the material produced from the warrants?

MR. REBOLD:  So, in terms of electronic devices, we do not yet, your Honor, and that is something I wanted to raise with the Court, and something I've at least floated to defense counsel that I will sort of bring your Honor up to speed on.

So the agents recovered a number of electronic devices during the arrests in this case.  They are on a queue, as I understand it, to be searched, if the searches haven't been conducted already, meaning to actually get into the devices to

1  provide a dump of the devices.

2        Where we have search warrants and not consent to

3  search the devices, as your Honor might imagine, the searches

4  are going to be somewhat time-consuming for several reasons:

5        First, because I imagine many of these devices contain

6  large volumes of information;

7        Second, because the vast amount of communications are

8  in Russian, and therefore need to be reviewed and translated

9  before they can be looked at for a relevant review, and

10  importantly in this case, because the case involved attorneys

11  and the nature of the charges involved applications and

12  testimony before immigration officials, including officers and

13  judges, they need to be reviewed with a taint team for

14  attorney-client privilege.

15        What we have floated informally, and in the last week

16  or so to defense counsel -- and I understand they may need some

17  time to confer amongst themselves -- is if the attorneys are

18  willing to agree to consent to have us produce the full dumps

19  of those devices to all of the other attorneys, that would

20  obviously drastically speed up the production of each of these

21  electronic devices.  If not, we will, of course, push things

22  out on a rolling basis as we're able to review for privilege

23  and relevance, but it may be a bit more time-consuming, your

24  Honor.

25        THE COURT:  All right.  So that conferral process is

1  ongoing, and you will let me know if you run into issues, but

2  time-consuming in either way, it sounds like.

3          MR. REBOLD:  Yes, your Honor.

4          THE COURT:  And then you said reports by FBI and DHS.

5  What do you mean by reports, and what's the volume there?

6          MR. REBOLD:  So, I mean, the reporting would include

7  just, you know, FBI 302s, DHS reports regarding one of the

8  confidential sources was a homeland security source, so much of

9  the reporting is sort of the standard, you know, FBI and DHS

10  investigative reporting that to the extent it's discoverable or

11  that we decide to turn it over even if it's not discoverable

12  can be turned around relatively quickly, but there is a

13  subcategory of discovery that I think is going to take a

14  considerably greater amount of time and that may be produced on

15  an ongoing basis, and that involves the USCIS files in its

16  possession that it can attribute to either Russian America or

17  any of the individual defendants as preparers of -- meaning

18  every client that Russian America has for whom they've prepared

19  an I-589 application, we are trying to track down.  Sometimes

20  it's easy to do that, sometimes it's less easy to do that

21  depending on, for example, Russian officials signed their names

22  as the preparers, which they sometimes did, or didn't sign

23  their names as the Russian preparers, which they often did not.

24          Then there is a separate agent of cases where, for

25  example, Julia Greenberg may have represented clients either

1  for Russian America or otherwise.  We are attempting and we are

2  making our best effort to identify, collect, scan and

3  ultimately produce all of those files to defense counsel so

4  that they have everything, even if they're not necessarily

5  files that we have detected at this stage as fraudulent, but

6  that is a time-consuming process, and I unfortunately don't

7  have a time horizon for your Honor, but I can say that it has

8  been hampered in large -- at least in part due to the

9  Coronavirus pandemic and the inability of staff to get their

10  hands on physical files and begin reviewing them.

11         THE COURT:  Anything else, Mr. Rebold, to flag in

12  terms of anticipated discovery?

13         MR. REBOLD:  No.  Just to say that notwithstanding the

14  caveats I've provided about the USCIS files and the electronic

15  devices, number one, we will of course work with defense

16  counsel so that we can push out discovery on a rolling basis

17  and provide them with the things that we anticipate would be of

18  most interest to them in terms of suppression motions and

19  direct evidence of the crimes or anything else defense counsel

20  flags for us that they think is of interest to them, but to

21  include search warrants, affidavits and the recordings and

22  draft transcripts that they formed the basis of the

23  investigation.  My hope is that the bulk of discovery can be

24  provided in the next six weeks but for the USCIS files and the

25  devices where the searches are ongoing.

1          THE COURT:  All right.  And, again, you are talking

2     about any application related or unrelated to the case that you

3     can identify as being submitted by Russian America.  Is that

4     right?

5          MR. REBOLD:  Yes, or in which we have been able to

6     identify Julia Greenberg as representing a client.  We're doing

7     our level best to try to locate those and gather those and scan

8     those and get those pushed out.

9          THE COURT:  OK.  So, from the communications to

10    chambers in advance with counsel cc'd and based on what you

11    just said, Mr. Rebold, the discovery that you've described

12    within the next, let's say, two months with some ongoing

13    discovery related to search warrant returns and the USCIS

14    files.

15          MR. REBOLD:  Yes, your Honor.

16          THE COURT:  And then, counsel, you've -- so the next

17    question is what's a realistic time frame for a motion schedule

18    based on the quantity and quality of discovery that Mr. Rebold

19    just described.  And I know, Mr. Kaser, I know you have an

20    objection to the proposed trial date but let me deal with

21    motions first.

22          MR. KASER:  That's fine.

23          THE COURT:  So it's been proposed that any available

24    defense motions, either based on the indictment or Rule 16 as a

25    result of Rule 16 discovery, would be filed on or before

1  July 15, 2021.

2          Mr. Kaser, do you have an objection to that time

3  frame?

4          MR. KASER:  No, I actually don't.  The motion schedule

5  that's been circulated I'm fine with.  It's the trial date that

6  I will have an objection to.

7          THE COURT:  OK.  Mr. Glozman, you're fine as well?

8          MR. GLOZMAN:  Yes, your Honor.

9          THE COURT:  Mr. Sharifov?

10          MR. SHARIFOV:  Yes, I am fine with that as well,

11  Judge.

12          THE COURT:  We will set that as our motions date.  Any

13  available defense motions as I described on or before July 15,

14  2021.  If any motions are filed, government's opposition due

15  August 12, 2021.  And defense reply on or before August 26,

16  2021.

17          What I do in my general practice is once the motions

18  come in, I look to see if any motions are filed and if any

19  motions are seeking an evidentiary hearing.  If any motions are

20  seeking evidentiary hearing, my chambers will reach out and

21  schedule a hearing to occur shortly after full briefing of the

22  anticipated motions.  That way we've got a hearing on the

23  schedule should we need it for resolution of the motions.

24          If no motions are filed or once motions are resolved,

25  I then put the case on the remainder of a schedule to get us to

trial date.  So that will be a date for in limine motions,

404(b) motions, proposed jury instructions and proposed voir

dire.  I know that you've discussed this and generally actually

what you suggest is absolutely fine.  Five weeks before trial

motions in limine and responses to those, and proposed jury

instructions and voir dire three weeks before trial.  That will

be fine.  I will set that final schedule once we get past

initial motions.

All right.  So, Mr. Rebold, if we do proceed to trial

with all four of the defendants, how long of a trial do you

anticipate?

MR. REBOLD:  I would think around, I would imagine,

this is a two to three week trial, your Honor, but I would just

caution that our investigation is ongoing, and I anticipate

that we are going to be identifying additional individuals

whose applications for asylum and legal status in this country

were presented -- prepared by Russian America under fraudulent

pretenses, and so that time frame can expand a little bit

depending on what we uncover in the coming months.

THE COURT:  So as you sit here, do you anticipate a

superseding indictment?

MR. REBOLD:  I think it is more likely than not that

there will be a superseding indictment.  If this case goes to

trial, I anticipate there will likely be a superseding

indictment that may either add charges or expand the conspiracy

1    period, yes, your Honor.

2          THE COURT:  And what is the anticipated time frame for

3    any such superseding indictment?

4          MR. REBOLD:  Well, I hazard to guess at that, your

5    Honor, just because, for example, based on just the release of

6    the indictment alone, we are first receiving information from

7    folks who have sort of worked with Russian America.  I don't

8    know yet.  This sort of falls under the category of we don't

9    quite know what we don't know yet.  So, without getting into

10   the particulars of the ongoing investigation, I hazard to guess

11   how long it will take and how many folks may come forward that

12   causes us to sort of change the landscape of what the

13   indictment looks like or the length of the trial.  Although I

14   don't imagine it's going to, you know, cause the trial to last

15   more than an extra week or so.  At some point if it becomes

16   cumulative, it seems more an issue of sentencing than proof at

17   trial; we wouldn't necessarily call any such witness.

18         THE COURT:  I will check back in down the road on

19   timing of a superseding indictment, so we can try to make sure

20   that the defendants know what they're looking at in advance of

21   trial.  And if a superseding indictment changes in any

22   substantial way what the defendants are dealing with, then

23   we'll go to trial on the earlier indictment and save the

24   superseder for down the road if need be, but I just want to

25   encourage the government if it plans to move on a superseding

1    indictment to do so expeditiously.

2          MR. REBOLD:  Yes, your Honor.  Understood.

3          THE COURT:  All right.  So we have our motion

4    schedule, and you have a basic sense of how I intend to

5    proceed.

6          My general practice before COVID has always been to

7    set -- especially in a multi-defendant case -- set a trial date

8    at the initial conference, and that is in my experience the

9    best way to ensure that we get to trial as soon as feasible

10   given the multiple calendars in issue, the scope of the case,

11   what needs to be done both by counsel and by the Court in

12   advance of trial.  So that is my practice.

13         Obviously, in the time of COVID, the Southern District

14   has just resumed jury trials.  I believe we've had one criminal

15   jury trial last week and this week since resuming following the

16   post-holiday spike, and as a result, the court is still using a

17   centralized scheduling system for jury trials, which means that

18   when I select a trial date, in the old days I would say that

19   absolutely will be the trial date, put it in your calendar, do

20   what you need to do to be ready to proceed to trial, I'm not

21   going to move the trial date.

22         I am still going to tell you that now, but with the

23   caveat that if we are still dealing with the centralized

24   scheduling system, I have to put in the request when I can and

25   see what we get.  A three-week trial is -- you know, there

haven't been any yet in a year, let's put it that way.

I know that everybody, except counsel for Ms. Greenberg, has discussed a trial date after June 13, 2022. Do I have that right, Mr. Rebold?

MR. REBOLD:  Yes, your Honor.

THE COURT:  And Mr. Glozman, that's acceptable to you?

MR. GLOZMAN:  Yes, your Honor.  Based on my personal backlog of jury trials for in-custody defendants that have to be reset in the next few weeks and the nature of the ongoing investigation, the discovery that's going to be coming in, I think that's the most prudent and practical date to set it.

THE COURT:  Mr. Sharifov?

MR. SHARIFOV:  That's correct, your Honor.

THE COURT:  Mr. Kaser -- am I saying your name right, Mr. Kaser?

MR. KASER:  It's actually Kaser, but that's OK.

THE COURT:  I had two options, and I chose the wrong one.  I apologize.

MR. KASER:  I am used to it.  Don't worry.

So, I understand everyone's position.  Normally I would take the position of, you know, push it out, don't want to speed up.  I know can speak about my client's speedy trial rights, due process, etc. but what this really boils down to is an anticipation by the government in a bail application to restrict my client's ability to work.  And if her ability to

1 work is going to be restricted in any way, I can't -- she will

2 not consent, and I can't agree to a trial date that is over a

3 year away. I don't know -- if I need to make a bail

4 application now, much of the arguments will be the same. My

5 hopes were that we had figured out the bail and whether your

6 Honor is going to restrict my client's employment before

7 deciding this, because, again, if her employment is not

8 restricted, we have less of a concern with a lengthy date

9 before trial. However, if her employment is restricted which

10 could make her unemployable, which according to pretrial is one

11 of the conditions of her release, we cannot let this drag out

12 for over a year. I understand the pandemic and scheduling and

13 everything like that, but again, my client has family to

14 support, a mortgage to pay, and she cannot afford to not be out

15 of work essentially for over a year while this case is pending.

16 THE COURT: OK. I understand those arguments, and I

17 think you're right that those are bail arguments, and I

18 understand how the two are intertwined. Realistically, this

19 case will not go to trial before a year's time based on the

20 quantity of discovery that's just been described, the

21 translation issues related to it, the schedule of all of the

22 participants and, frankly, the Court's schedule and backlog of

23 trials that have been pending far longer than this one. I have

24 many defendants incarcerated who will need to be tried first.

25 Now, I will hold -- you know, we can always find other

1    judges to try cases, I will try two cases at once, I will do

2    whatever it takes; but realistically, based on the scope of

3    factors that have been described, I mean, even if there weren't

4    a backlog, I don't see this case going to trial earlier than a

5    year, given the number of defendants, the scope and nature of

6    the discovery and the schedules of counsel.

7            Throw into that the coordinating scheduling process

8    that the district is using now in light of COVID, and including

9    in that COVID generally slows processes down including issues

10   related to defendants being able to review discovery with

11   counsel and safety issues related to that.  It's just in the

12   realistic.

13           I believe in fixing realistic trial dates and sticking

14   to them with the caveat that there is only so much in my

15   control right now, but I will accept the date agreed to by the

16   others because I think that that is the amount of time that's

17   needed here under the circumstances.  So, trial will commence

18   on June 13, 2022.  I will put it on my calendar for three weeks

19   at that time if we are proceeding to trial, and, obviously,

20   Mr. Rebold, if more time is needed because of a superseding

21   indictment, we will need to address that sooner rather than

22   later so that I can reserve that time on my calendar.  But it

23   is the Court's assessment based on what I've heard that that is

24   as soon as we can get the trial under the circumstances.

25           All right.  As I say, if we are back in a normal

1    circumstance where this is going to take place in my own

2    courtroom and I control the schedule, I guarantee we will start

3    on that date.  If we are still in a centralized scheduling

4    system, as soon as I'm able to request a jury for that time, I

5    will do so, and I will let counsel know as soon as I have any

6    further information.

7         Let me also say because of my practice for setting a

8    hearing date, should any motions necessitate the hearing date,

9    I don't always schedule a status conference at this point.  If

10   anybody wants a status conference, I'm happy to schedule one.

11   If you want to schedule now, and you just want to request one

12   down the road, we can get one on the calendar quickly, and I'm

13   happy to bring everyone in should we need it, but I don't see a

14   need for status conference at this point given the schedule

15   that we have.  I will bring you in for a hearing if any of the

16   motions necessitate it.

17        With that, Mr. Rebold, does the government have an

18   application for an exclusion of time?

19        MR. REBOLD:  We do, your Honor.  The government

20   respectfully requests that the Court exclude all speedy trial

21   time between today and the scheduled date of trial, among other

22   things, in the interest of justice so that the government can

23   produce discovery, the parties can review discovery, can

24   contemplate filing motions and can negotiate a disposition that

25   the defendants may be favorable to what they would potentially

1    face after trial.

2              THE COURT:  Mr. Glozman, any objection?

3              MR. GLOZMAN:  No objection on behalf Mr. Mosha.

4              THE COURT:  Mr. Sharifov?

5              MR. SHARIFOV:  No objection on behalf of Mr. Danskoi,

6    your Honor.

7              THE COURT:  Mr. Kaser, I assume you do have an

8    objection?

9              MR. KASER:  Unfortunately, Judge, no -- I completely

10   understand everyone's position, but I have to object given I

11   don't know what's going to transpire in the next couple of

12   minutes.

13             THE COURT:  I understand your position.  You don't

14   need to apologize for making an objection.

15             Nevertheless, I do find that the ends of justice

16   served by granting an exclusion from speedy trial computations

17   for the period from today's date through June 13, 2022 outweigh

18   the interests of the public and the defendants in a speedy

19   trial.  The time is necessary for the production of voluminous

20   discovery, review of that discovery by the defendants, time for

21   the defendants to consider and prepare any available motions,

22   and time for the parties to negotiate potentially resolutions

23   of the case.  In the absence of that, time for the parties to

24   prepare for trial.

25             With that, I think -- I know obviously, Mr. Kaser, on

1  behalf of Ms. Greenberg, we need to talk about what the bond is

2  going to look like.

3          Mr. Turano -- I think with that, we can end with

4  Mr. Glozman and Mr. Sharifov on behalf of Mr. Mosha and

5  Mr. Danskoi.

6          Mr. Rebold, do you agree that we are finished with

7  them?

8          MR. REBOLD:  Yes, your Honor.

9          And am I correct that Mr. Kmit still needs to follow

10  or is he part of this proceeding?

11         THE COURT:  I do need to address Mr. Kmit separately,

12  but I do think I can let other two defendants and counsel go.

13         Mr. Glozman, do you have anything further?

14         MR. GLOZMAN:  Not today, your Honor.

15         THE COURT:  Mr. Sharifov?

16         MR. SHARIFOV:  Not at this time, your Honor.  Thank

17  you.

18         THE COURT:  All right.  So, I will say good-bye to

19  counsel for Mr. Mosha, Mr. Danskoi, and their counsel.  You may

20  leave the proceeding at this time if you like.  You could also

21  stay.  It's up to you.  But you're free to go.

22         Mr. Turano, do we have Mr. Kmit now?

23         MR. TURANO:  Your Honor, I'm going to ask the

24  interpreter.  I don't know the answer to that.  I know he has

25  been listening, but from what I can glean, he can listen in

1  English, but he can't seem to connect with the interpreter but

2  maybe that's changed.

3          THE COURT:  For our interpreter, have you been able to

4  communicate with Mr. Kmit.

5          THE INTERPRETER:  This is the interpreter, Yana

6  Agoureev.  No.  Mr. Kmit not access the interpretation line.

7          MR. TURANO:  I think as to that line, he wasn't able

8  to speak.  He could listen only, which made it meaningless, but

9  he has been on.  And he says both numbers he tries are English

10 only, no translator.

11         THE COURT:  Here is what we are going to do:  I am

12 going to proceed with the bail hearing, Mr. Turano, and maybe

13 we can try to reschedule for this afternoon.  And my deputy

14 once we're done can call and work with you and make sure you

15 have what Mr. Kmit will need.  I think that makes the most

16 sense.

17         I also have another -- my deputy tells me that

18 Mr. Kmit had the wrong number.  Can I ask the interpreter to

19 state now -- well, I don't want to do that orally on the public

20 line.  Mr. Turano, we will work with you and Mr. Kmit

21 separately, and we will do the arraignment and set the case on

22 the same schedule this afternoon.  It won't take long, but I do

23 need to make sure I am communicating directly with Mr. Kmit.

24         MR. TURANO:  Very well, your Honor.

25         THE COURT:  Thank you.  You may leave if you like.

1           Go ahead, Mr. Kaser.

2           MR. KASER:  OK.  So my client, you know, she was

3   originally bonded out in Colorado.  She has had pretrial

4   services interview her.  They have submitted, I believe, a

5   report to the Court.  They have certain recommendations which

6   are less onerous -- that she is already on in Colorado.  I

7   wanted to address removal of the GPS ankle monitor.  I tried to

8   do that with the government.  They countered, but then they

9   included a preclusion for my client to be able to practice

10  certain areas of law, which unfortunately is basically the sole

11  area that she practices in.

12          Again, I would oppose this.  There is a presumption of

13  innocence.  She is the sole bread winner for her family, which

14  includes her husband, her three children, her elderly mother.

15  She owns property in Staten Island, so she has bills to pay.

16  Her primary practice is immigration law, and if she is going to

17  be precluded from practicing immigration law between now and

18  the trial, that is well over year that she will not be able to

19  practice.  I'm not sure how easy it is for her to jump into

20  other areas of law.  I don't think it makes sense for her to

21  take a minimum wage job just to work.  She won't be able to

22  afford the support that she needs for the people in her life,

23  her family members.

24          So we are asking -- I would ask that she be continued

25  on bond with the recommendations from pretrial services and

that there be no be restrictions on her ability to work.

I can go through those specific items with pretrial, if your Honor would like.

THE COURT: Let me turn to Mr. Rebold.

Mr. Rebold, what are the specific provisions that are in issue? Let me pull up the pretrial services report.

Go ahead, Mr. Rebold.

MR. REBOLD: Yes, your Honor. So, there are a few things in issue. Well, pretrial appears to be recommending a continued submission to location monitoring, but that is certainly something we join in.

We are recommending that three cosigners be added to the terms of the bond, that are persons that are both financially responsible and persons of moral suasion. And in light of the defendant's means, we are asking that the bond amount be increased from $100,000 to $300,000. And Mr. Kaser is correct that we are respectfully requesting that the defendant be ordered to not perform immigration services or practice immigration law during the pendency of the case.

If I might, your Honor, I can explain why we're asking for this.

THE COURT: OK. Go ahead.

MR. REBOLD: Your Honor, I've laid out the background of the case and established, I hope at least in some part, both its seriousness and the strength of the evidence, particularly

1 relating to Ms. Greenberg; but in addition to being depicted in

2 explicit recordings with sources, my understanding from

3 conferring with the agents who conducted her arrest, she gave a

4 confession to knowingly assisting both of the sources in this

5 case commit asylum fraud by preparing them for and accompanying

6 them into their asylum interviews.

7 I should note specifically regarding the request that

8 she not practice law, that if she is convicted, she will be

9 disbarred. And so while I understand that we are not at a

10 guilty verdict at this stage, it is a consideration that

11 Ms. Greenberg may need to seek other employment in the long

12 term generally.

13 So, in addition to this being a strong and serious

14 case, there are concerns about Ms. Greenberg continuing to

15 conduct immigration services and representation. First,

16 because we understand that she may be continuing to represent

17 people who have been committing asylum fraud. The nature of

18 the charge is asylum fraud. The nature of her work is to

19 accompany clients into interviews conducted by USCIS and

20 represent them during proceedings by immigration judges.

21 The government respectfully submits that asking her to

22 not practice immigration law for the pendency of these

23 proceedings would be akin to a person who is being charged as a

24 corrupt bank manager being instructed not to work in the

25 financial services industry during the pendency of his case.

1   It seems, respectfully, to be a relatively straightforward

2   issue.  We are not submitting that she shouldn't be able to

3   practice law at all.  We are not submitting that she not be

4   permitted to work at all.  We are not submitting that she be

5   restricted to home detention or home confinement.  We are

6   simply asking that the Court not have her practice immigration

7   law.

8           In addition to sort of the potential danger she poses

9   sort of in continuing to potentially represent clients in this

10  way, there are other serious Fifth and Sixth Amendment

11  considerations that I think need to be taken into account here,

12  and I can give an example, your Honor.

13          I learned, and upon learning this, I immediately

14  reached out to Mr. Kaser to apprise him of this.  I felt at the

15  time that as a professional courtesy to help avoid this from

16  happening moving forward, but I learned that subsequent to

17  Ms. Greenberg's arrest and indictment, she accompanied another

18  client into a USCIS asylum interview.  During the interview, my

19  understanding -- and I received this third or fourth-hand at

20  least -- but during the interview, my understanding is that the

21  asylum officer asked a question that is not atypical of an

22  asylum interview generally, although certainly would be

23  understandable in the instance case, which is where the asylum

24  client -- how the asylum client came to retain their attorney.

25  My understanding is at that point Ms. Greenberg jumped in.  She

1    requested to speak to a supervisor.  She made inculpating

2    statements about the instant investigation and the charges, and

3    claims that this was sort of part of a witch hunt.

4         The USCIS's job when they conduct these interviews of

5    asylum applicants is to try to detect if and when people are

6    seeking asylum under fraudulent pretenses to assess whether

7    these are legitimate applications, and it is their job to ask

8    probing questions of that nature to the applicants who are

9    seeking asylum.

10        I can't -- most of those USCIS -- in fact, all of

11   those USCIS asylum officers at the ground level, they're not

12   part of the prosecution team.  They're doing their job

13   conducting interviews to assess for fraud and other things.

14   So, we can't ask them or instruct them not to ask the probing

15   questions that they're supposed to ask, and we can't preclude

16   Ms. Greenberg from jumping in and making statements that can

17   potentially be used against her.

18        There is also a negative inference that can be drawn

19   on her clients that she is accompanying into these proceedings

20   just by the fact of her representation at this stage.  So there

21   are a host of issues, your Honor, that I think relate

22   specifically to her practice of immigration law.

23        And while it's not lost on us that that could present

24   at least a short term hardship for her, it is simply not

25   uncommon whether the defendant is a lawyer or a worker at a

1  bank or a worker in any other field who have their bread and

2  butter practice restrained during pendency of criminal cases

3  for the obvious reasons that I've laid out, your Honor.

4  THE COURT:  Let me just ask because I don't think I've

5  addressed this issue previously or dealt with it.  Do you have

6  authority -- do you have examples or written opinion authority

7  that discusses this kind of pretrial restriction?

8  MR. REBOLD:  Not in hand, your Honor, but I can tell

9  you that I've had many cases -- and this is my first

10 immigration fraud case, with the exception of another case

11 where the arrests were made on the same day in a related

12 investigation where the attorneys both agreed, consented to not

13 practice immigration law, and that would be the case of the

14 United States v. Ilona Dzhamgarova, 21 CR 58, before the

15 Honorable Mary Kay Vyskocil.  I have not researched the issue,

16 but I can say it is common practice to have certain forms of

17 vocation be restricted by pretrial services as part of

18 individual bail packages.  Frankly, whenever anybody is

19 subjected to home incarceration, for example, they're

20 restricted from working at all.

21 THE COURT:  Well, that's not necessarily true either.

22 Sometimes there are exceptions for employment and sometimes

23 remote work of some kind is possible, so I don't know that it

24 follows necessarily from home incarceration that employment is

25 ceased.

1          MR. REBOLD:  I think that's a fair point, your Honor,

2     although -- I highlight it only to say that there are much more

3     onerous restrictions that courts place on individuals' ability

4     to maintain employment broadly.  We are not asking that the

5     Court go in with a hacksaw here.  We are asking that the Court

6     go in with a scalpel and carve out -- it's not lost on me this

7     is the primary area of her vocation at this point, but we're

8     asking, again, not that she be restricted from practicing law,

9     but that she be restricted from practicing immigration law and

10    providing immigration consultation and immigration services due

11    to the nature of these offenses and due, again, to the ongoing

12    investigation and questions that are invariably going to come

13    up during interviews of clients, during asylum officer

14    hearings, and during immigration proceedings before immigration

15    judges.  I think it's just impossible to sort of extricate the

16    issues that we've laid out that can come up during any one of

17    these interviews, even if Ms. Greenberg is willingly availing

18    herself of those interviews.  And to the extent that she is

19    attempting to stop officers from asking those questions, that

20    is not benefiting her clients for whom the agents are asking

21    legitimate questions.  And so I know this doesn't answer the

22    question do I have a case in hand in front of me, but I do

23    think there is certainly -- it is certainly the case that

24    individuals' employment or forms of employment are regularly

25    restricted by courts in this district every single day, your

1   Honor.

2        THE COURT:  I mean, I guess that's the question.  If a

3   lawyer is under indictment, which happens certainly

4   occasionally in the district, probably a couple a year, is it

5   standard to restrict their ability to practice law in the area

6   that produced the issue.  I could tell I'm going to want some

7   briefing on this.  I want to look and see if there is law on

8   this.

9        So I can hear you now, Mr. Kaser, or what I would

10  suggest is everybody do a little bit of short letter briefing

11  on the issues, see what the examples and authorities are, and

12  then I will bring you back in for a hearing on it.  But I

13  suspect I'm not going to satisfy myself that I know how I want

14  to resolve until I've had some opportunity to look at the law

15  on the issue.  Mr. Kaser, any reason?

16       MR. KASER:  That's fine, your Honor.  The only thing I

17  was going to point out is Mr. Rebold did mention that in

18  previous cases pretrial had recommended this, and we are not

19  getting that recommendation here.  But, again, it doesn't sound

20  like you're going to make a decision without being a little

21  more briefed, and so maybe that would behoove us all to submit

22  written briefs.

23       THE COURT:  I would like a little briefing on this.

24  Maybe there's nothing out there, but I suspect at the least the

25  government may have examples of other cases, and, Mr. Kaser,

1    there may be some law out there suggesting the impermissibility

2    of the restriction in some circumstances.  I just don't know,

3    and I don't want to make a snap decision without being

4    informed.

5            Mr. Rebold, do you have any concerns with that

6    process?

7            MR. REBOLD:  No, not at all, your Honor.  But just in

8    the event that I said that pretrial services previously

9    recommended such a restriction, that is not the case.  What I

10   was hoping and attempting to communicate was that in a

11   companion case, defense counsel agreed that that was an

12   appropriate term of the bail package, but pretrial did not in

13   that case weigh in and, frankly, we did not litigate the

14   legality.  So I just want to make clear that I wasn't

15   suggesting pretrial weighed in on this issue before.

16           MR. KASER:  I may have misheard.  I apologize, if

17   that's the case.

18           THE COURT:  Mr. Rebold, what's the government's

19   request in the meantime and schedule, so that the -- the

20   current bond is in place, and you're seeking the restriction on

21   the performance of immigration legal services and counseling,

22   and increasing the bond to $300,000 and adding additional

23   cosigners, right?

24           MR. REBOLD:  I am.  And I am also opposing the

25   defendant's request that GPS monitoring be removed.  There are

1    some things I would like to raise with the Court regarding

2    these issues.

3            THE COURT:  Here is what I would like to do.  I am

4    actually -- I now apologize, because of the delay, I am ten

5    minutes late for another proceeding.  And since we're going to

6    do briefing anyway, my suggestion is to just conclude it all,

7    and I'll get your views and bring you back, hear from you and

8    give you my conclusion.

9            So, Mr. Rebold, by request or my suggestion is to

10   continue the current bond and let both sides put in a little

11   bit of writing, nothing extensive on these issues, and then

12   I'll bring you back next week.  How's that?

13           MR. REBOLD:  That's just fine, from the government's

14   perspective, your Honor.

15           MR. KASER:  Next week is extremely busy for me.  I

16   have a trial in the middle of next week also.  I don't know if

17   this is something that can go out the week after or if that's

18   too much time.  I can try to make other arrangements.

19           THE COURT:  Mr. Rebold, is that fine?

20           MR. REBOLD:  Yes, whenever is workable for Mr. Kaser

21   and the Court, we'll be available.

22           THE COURT:  I have time the week of the 22nd.  Why

23   don't we set it for Tuesday, the 23rd, at 11:00 a.m.?

24           MR. KASER:  That works for me.

25           THE COURT:  Tuesday, the 23rd at 11:00 a.m.  Working

1    from that, Mr. Rebold, you will put in some letter briefing by

2    how about by Friday, and then Mr. Kaser, by Tuesday -- I guess

3    the question is whether we need a reply brief or not, otherwise

4    I can give you more time.  My concern on the briefing is just

5    we've got -- well, you know what the issues are, Mr. Rebold, so

6    you can address also the defense's address to remove location

7    monitoring in your opening papers, OK?

8          MR. KASER:  Might I make a suggestion if it works for

9    your Honor to have these papers due maybe the 15th and have

10    mine due -- I don't want to say the 22nd, that might be too

11    close to the court date, but I am anticipating by next week not

12    allowing me to do this in the first two days also.

13          THE COURT:  That's fine.  There will be no reply in

14    that instance.  It will be the government by the 15th and the

15    defense by the 22nd.

16          Mr. Rebold, acceptable?

17          MR. REBOLD:  Yes, of course, your Honor.

18          THE COURT:  And just include your arguments as to why

19    location monitoring should stay in place in your papers,

20    Mr. Rebold.

21          MR. REBOLD:  We will, your Honor.

22          THE COURT:  OK.  So we've got a schedule for that.

23    And I will appreciate any authority either of you can give me

24    on the issue of the employment restriction.  And we'll take it

25    up then.

1          Anything further, Mr. Rebold?

2          MR. REBOLD:  No, not from the government, your Honor.

3          THE COURT:  Mr. Kaser?

4          MR. REBOLD:  Oh, your Honor?  I'm sorry to jump in.  I

5     know this is -- I'm mentioning it because I know it's sometimes

6     after presentments, so just in case this is a follow-up thing

7     that the Court would have otherwise asked.  The defendant was

8     arrested on February 18 just after 6:00 a.m. mountain standard

9     time in the vicinity of Breckenridge, Colorado.

10          THE COURT:  OK.  Thank you.  Anything else,

11    Mr. Rebold?

12          MR. REBOLD:  No, your Honor.

13          THE COURT:  Mr. Kaser?

14          MR. KASER:  Nothing else, your Honor.

15          THE COURT:  Everybody stay safe.  We're adjourned.

16    I'll see you in a few weeks.

17          (Adjourned)

18

19

20

21

22

23

24

25