## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **1:21-cr-00092-JPO** |
| **vs.** | ) | |
| | ) | |
| **YURY MOSHA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>DEFENDANT YURY MOSHA'S SENTENCING POSITION PAPER</u>

Now comes the defendant, Yury Mosha, by and through his undersigned attorney, and respectfully requests that this Honorable Court, in light of *Gall v. United States*, 552 U.S. 38 (2007) and the factors set forth in 18 U.S.C. § 3553(a), sentence him to a non-custodial sentence. A sentence of non-incarceration, with whatever conditions this Court deems appropriate, will give Mr. Mosha the chance to remain in the United States – with his wife and two minor children, ███████ ███████ – a country he has called his home for over a decade and that he came to escape political persecution. Such a sentence, given the applicable Section 3553(a) factors including the lack of criminal history and prior incarceration, the dire collateral consequences of the conviction, his personal and family history, his mental health considerations, lack of need for specific deterrence, a unique level of acceptance of responsibility, and full prepayment of forfeiture, is one that is sufficient, but not greater than necessary, to comply with the purposes of sentencing. In support, the following is offered:

## INTRODUCTION

It is difficult to do justice within the context of a sentencing submission to the shame and embarrassment Mr. Mosha has self-imposed on himself.  The reality, however, is that his current situation is only attributable to his own serious lapses in judgment.  Still, since being apprehended by federal agents two-and-a-half ago, Mr. Mosha's life has been consumed with anxiety, humiliation, and anguish as he has waited for his time before this Honorable Court for judgment. These feelings have manifested themselves both physically and emotionally, particularly in light of his mental health conditions. Now, Mr. Mosha comes before this Court extraordinarily humbled and contrite. He is deeply ashamed and angered with himself; that he behaved in such a manner that was so inconsistent with the values that were instilled in him at a young age by his parents and that he is subsequently passing on to his children. Much of his life has been to working hard, helping others, and his family.

Truly, Mr. Mosha is a broken and defeated man.  Mr. Mosha's request for a non-custodial sentence is not evidence of his lack of acceptance of responsibility or remorse.  Rather, it is quite the opposite.  It is the effort of a man in a desperate attempt to salvage a life that was once dedicated to career advancement and is now fully dedicated to maintaining his family.  After more than twelve years of living in this country, starting a family, and restarting his life, Mr. Mosha worries every day about being deported, losing his family, and being forced to return to a war-torn Russia, which he initially fled because of oppression and retaliation.

The immigration and collateral consequences faced by Mr. Mosha are so severe

that they, in conjunction to all of the other section 3553(a) discussed herein, support a non-custodial sentence. A non-custodial sentence would give Mr. Mosha the chance to remain with his seven- and four-year-old daughters. Although nothing is certain, he hopes for a sentence that will give him the opportunity to remain a productive and law-abiding member of society, in a country that is his home.

There is no denying the seriousness of Mr. Mosha's transgressions, and he does not intend on doing so – he was clearly wrong. Instead, he offers himself to the mercy of this Court, to take into consideration not only those actions that brought him before this Court, but to take into consideration the full value of a man's life that was more often than not guided by principles of kindness and benevolence, when fashioning its sentence. Ultimately, a non-custodial sentence will take into account the relevant considerations set forth below and result in a punishment that is appropriate, reasonable, and sufficient, but not greater than necessary, to comply with all of the purposes of sentencing.

## SENTENCING CONSIDERATIONS PURSUANT TO 18 U.S.C. § 3553(A) SUPPORTING A NON-CUSTODIAL SENTENCE

This Court maintains unfettered discretion to fashion a sentence that punishes the offender, as opposed to the crime itself. *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011); *United States v. Cavera*, 550 F.3d 180, 188 (2nd Cir. 2008)("A sentencing judge has a very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime.") It is the sentencing court that "is in the best position to judge the appropriateness of a sentencing departure in light of the defendant's overall history and character, his remorse or lack of it, and other factors

bearing on the sentence to be imposed." *United States v. Crowley*, 318 F.3d 401, 421 (2nd Cir. 2003). *See also United States v. Corsey*, 723 F.3d 366, 374 (2nd Cir. 2013) (stating that sentencing courts have broad discretion to fashion a sentence due to being "better positioned institutionally to determine the appropriate sentence in a particular case."). After first calculating the applicable sentencing range, district courts are then tasked with imposing a sentence that is reasonable under 18 U.S.C. § 3553(a). However, because sentencing guideline ranges are not to be presumed reasonable, this Court must consider whether they actually conform to the circumstances of the case.[1] *Nelson v. United States*, 555 U.S. 350 (2009) (*per curiam*); *United States v. Genao*, 869 F.3d 136 (2nd Cir. 2017)( "A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense.")

In doing so, this Court should consider the respective parties' arguments as to whether the guidelines range should apply, but "without any thumb on the sale favoring a guideline sentence." *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007); *see also Sparks v. United States*, 555 U.S. 261, 264-65 (2009) (district court may sentence a defendant to a sentence below the guideline range based on a disagreement with a particular guideline even in an ordinary case). *United States v.*

---

[1] While the Guideline ranges "reflect a rough approximation of sentences that might achieve § 3553(a) objectives," trial "judges have greater familiarity with the individual case and the individual defendant before him than the Commission or the appeals court." *United States v. Henderson*, 649 F.3d 955, 959 (9th Cir. 2011) (internal quotations omitted). "A district judge's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside the heartland to which the Commission intends individual Guidelines to apply." *Id*.; *quoting Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

*Jones*, 531 F.3d 163, 171 (2nd Cir. 2008) (stating that constitutional concerns prohibit a presumption of unreasonableness for below guidelines sentences as the Sixth Amendment prohibits "rules or standards that effectively place a thumb on the scales in favor of Guidelines sentences.") (quoting *Kimbrough v. United States*, 128 S. Ct. 558, 577 (2007) (Scalia, J., concurring)). So long as the selected sentence is "rooted in § 3553(a), sufficiently individualized to the circumstances of [the] case, and generally associated with sentencing leniency[,]" a below guidelines sentence is appropriate. *United States v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007)

In fashioning his sentence – one that is sufficient but not greater than necessary – Mr. Mosha respectfully asks this Court to consider the § 3553(a) considerations discussed below. *United States v. Pugh*, 945 F.3d 9, 24 (2nd Cir. 2019)( "Having considered all of the § 3553(a) factors, the district court must reach an informed and individualized judgement in each case as to what is sufficient but not greater than necessary to fulfill the purposes of sentencing.").

## A. ADVISORY GUIDELINE RANGE

A sentencing court's inquiry begins by calculating the defendant's advisory Guideline range. *Cavera*, 550 F.3d at 189 ("A district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range."); *United States v. Schroeder*, 536 F.3d 746, 755 (7th Cir. 2008). The parties agree that Mr. Mosha's advisory guideline range is 12 to 18 months' imprisonment based on an adjusted offense level of 13 and a criminal history category I.

However, a sentencing court may not presume a sentence with the Guideline range is reasonable. *Cavera*, 550 F.3d at 189. Nor can it presume that a sentence below the guideline range is unreasonable. *United States v. Jones*, 531 F.3d 163, 171 (2nd Cir. 2008). The Guidelines range is just one factor among the others that are considered when fashioning a sentence. *See United States v, Ingram*, 721 F.3d 35, 37 (2nd Cir. 2013) (stating that the "advisory Guideline range" is one factor to consider during sentencing). As one district court judge has put it, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula."[2]

### B. MOSHA'S PERSONAL HISTORY AND CHARACTERISTICS

Despite the setbacks and hardships Mr. Mosha has faced throughout his life, his never-ending drive and determination has left a profound impact on his family, friends, and co-workers. Notwithstanding his impoverished upbringing, the political and moral oppression he faced, his loss of various family members, the difficulties of starting a life in a new country, ███████████████████████, his own mental health struggles, and the instant indictment, among many other, Mr. Mosha has continued to move forward, work hard, and try to make the best of the situation he finds himself in. The character letters submitted on his behalf are replete with individuals who find Mr. Mosha to be a "positive, kind, honest, and very sympathetic person."[3] Indeed, he has made mistakes and he would be remiss to say or think

---

[2] Terry Carter, *Rakoff's stance on the SEC draws fire, praise – and change: The Judge Who Said No*, ABA Journal, Oct. 2013, at 53.
[3] Lidia Rogozina letter.

otherwise.  But there is much more to Mr. Mosha than the allegations against him. Throughout his life he was never motivated by evil or by malice.  He is a man that has tried to do the right things but, on some occasions, finding himself validating the improper means with the justifiable end.

Born in 1975 as one of two children to Igor and Tatyana, Mr. Mosha was raised in Novorossiysk, Russia during the heigh of communist rule.  His father, who passed away in 2006 at the age of 54, worked as a railroad technical director, and his mother, who is currently 70 and suffering from asthma, cardiac problems, and hypertension, worked various social interest jobs.  His family lived in depressed and minimal standards of living; they were always looking to make ends meet.  New cloths, nutritious meals, and entertainment, such as watching movies, were scarce and considered a luxury.

Growing up there was a food and water shortage.   In his region, the government only provided water to families for six hours a day – three in the morning and three in the evening.  Getting food was not much easier.  Food was a a coupon distribution system and must was not readily available.  Only food that the government deemed "necessities" was – at least relatively – more easily accessible, with individuals waiting in lines for hours just to get their respective families a loaf of bread.

Education was always very important in Mr. Mosha's family.  From a young age, Mr. Mosha "has always been inquisitive and active, and studied well at school."[4]

---

[4] Olga Kuzminichna letter.

He was "an intelligent and obedient child. He studied easily and excellently in school."[5] And this was not simply because his parents' "determination to give him the best education." PSR, ¶ 80. Mr. Moshas was "strict and demanding" on himself, "always busy. [Mr. Mosha] worked hard on his education."[6]

Once in high school, things started to look up for Mr. Mosha. The convergence of the collapse of the Soviet Union and his dedication to schoolwork led to him winning a contest with a private television company, which he parlayed into working as a journalist. A job that he persisted with throughout college. Mr. Mosha attended Kuban State Technological University where he ultimately graduated with a degree in economics management. He would attend college in the mornings and work in the evening. At that time, advertising and marketing started to become the emerging industry in Russia as it attempted to shed its communistic oppression of businesses. That led Mr. Mosha to leaving his job as a journalist and getting involved in advertising and marketing industry. He got a job and became head of the marketing department soon thereafter.

There, Mr. Mosha met his first wife, Olga. They married in 1996 and stayed married for two years. Between being married and working together, it was too much for the young couple. In the ensuing years, Mr. Mosha was in another committed relationship with Tatiana, with whom he had his first child: a son who is now twenty years old. Although they now live half-the-world apart, Mr. Mosha remains active in his sons life, regularly communicating with him, providing emotional and economical

---

[5] Tatiana Mosha letter, pg. 1.
[6] Mosha Sergey Igorevich letter.

support for both him and his mother.

Mr. Mosha had a natural knack for the advertising and marketing industry and found himself succeeding in all his ventures.  Still, his prior work as a journalist had developed a keen interest in human rights and social justice.  He "has always supported [such] activities, even though it was very disadvantages and even dangerous for businessmen in Russian."[7]  Nevertheless, Mr. Mosha became a social leader in his town.  As remembered by a long-time friend:

> The cultural life of our provincial town thrived because of the activities launched by Mr. Mosha.  He was always the first to enlighten the citizens of our town with new, interesting, and progressive ideas.  After the release of "Affordable Housing" Federal program for construction, he was the first to bring this project to life.  He gave people with low income an opportunity to buy an apartment in the most picturesque and ecological clean area of the town next to the sea.  I believe [Mr. Mosha] is a philanthropist who was participated in various charitable events many times.  Mr. Mosha helped his employees in complication. Situations and promoted young people not only in his companies but in political circles.  [Mr. Mosha] always wanted to move forward and did everything for that as an educated, progressive, energetic, and creative person.[8]

As part of his social campaign, Mr. Mosha help found the Novorossiysk Human Rights Committee which sought to protect the rights of ethnic minorities in Kuban. This was very unpopular with the local government, leading to Mr. Mosha facing harassment from the government, mayor, and prosecutor.  Among other things, he was threatened with prosecution, his vehicle was set on fire, his co-founder was assaulted, and their businesses were constantly raided.  The "corrupted system in the country, inspections, threat and courts made [Mr. Mosha's] and his family's life

---

[7] Vadim Karastelev letter.
[8] Elena Shcherbakova letter.

unbearable."[9]  Mr. Mosha was "under moral pressure"[10] and decided it was in his best interest, for his life, to immigrate to the United States. See also, https://www.refworld.org/pdfid/4ea7b3fb11.pdf (last accessed May 17, 2023).

Mr. Mosha came to the United States as a political refugee in 2011 with his second wife Natalia and their young daughter Maria.  Their family life here, however, was short lived.  Natalia had trouble adjusting to live in the United States and shortly after moving here, decided to move back to Russia with her daughter as she "did not want to be an immigrant and go through the hardships that are associated with acclimating to a new country and new culture." PSR, ¶ 87.  They ultimately divorced.

Returning to Russia was not an option for Mr. Mosha.  Notwithstanding his "admir[ation] of this country"[11], it was too dangerous for him to return to Russia.  He was well-known, as was his opposition (a position he has maintained throughout his time in the United States through various publications), not only in his hometown, but throughout the country.  It was too risky, and his life would be in peril, should he return.  Mr. Mosha set out to make a new life for himself in New York.

Mr. Mosha met his now-wife Irina, when they lived in the same apartment building in New York City.  They married in 2016 and have two beautiful daughters together, Nicole, four (4), and Sofia, seven (7). ██████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

---

[9] Tatiana Mosha letter, pg. 1.
[10] Lidia Rogozina letter.
[11] Tatiana Mosha letter, pg. 1.

█████████████████████████ They all live in a modest house in State Island with Mr. Mosha's in-laws.

Mr. Mosha is a "good father and husband."  PSR, ¶ 91.  "He is of good moral character, honest, loyal, and extremely considerate regarding his wife."[12] Together, there are simply "immigrants [who] work very hard for [their] kids."[13]  And Mr. Mosha, particularly, "is a caring and dedicated father.  His two daughters are the center of his life, and he has taken care of all their needs."[14] "He reads a lot to them, introduces children to the culture of different nations. . . Together with his daughter, [Mr. Mosha] visits museums, exhibitions, and art galleries on the weekends. He visits concert halls where his children perform."[15] █████████████████████

████████████████████████████████████████

█████████████████████████████ ■ Clearly, Mr. Mosha "is a good and caring father who loves his kids."[17]

This sort of caring nature is not exclusive to his family life.  Through his business career, Mr. Mosha established himself as "a charismatic leader. . .a very sympathetic person, always taking care of the staff, as if [they] were a family."[18] No only was he seen as a "goal-orient person, a workaholic who devotes a lot of time to his work and cares about its results,"[19] but also as a "decent and well-mannered man

---

[12] Anna and Slava Breusov letter, pg.  1.
[13] Irina Proskurina letter.
[14] Anna and Slava Breusov letter.
█████████████████████
■ ■
[17] Oksana Beytulla letter.
[18] Galina Kapitonova letter.
[19] Maxim Krupsky letter.

who respects other people's work and is willing to support others in their endeavors."[20]   To his core, he is a "kind, smart, efficient, purposeful, great business man[.]"[21]

And this is a common theme seen throughout the character letters submitted on his behalf.  Mr. Mosha is:

> a very supportive person who has the ability to see and understand things from another person's perspective.  Consequently, he has great empathy for others. . .attentive to the problems of his colleagues and friends.  He is a wonderful friend who is always happy to see you and ready to provide you with full-hearted help on any issue he feels he would assist you with without even a little thought of getting a favor back.[22]

But now, in his time of need and vulnerability, he asks this Court to consider such acts that were unknown to all but a few people until this point, because "surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F.Supp.2d 506, 513-14 (2d. Cir. 2006).

Mr. Mosha deeply regrets the decisions that he made in this case.  Coping with these situations is never easy, but for someone as fundamentally good-hearted as Mr. Mosha, it is that much more difficult.  Mr. Mosha now battles his emotions, being in a constant state of grief, regret, and anxiety.  These feelings are that much more exasperated due to his mental health struggles as discussed *infra*.  Even though Mr.

---

[20] Yuliia Rout letter.
[21] Irina Proskurina letter.
[22] Anna and Slava Breusov letter, pg. 1.

Mosha "is a strong person," due to his mental health, stressful situation can "knock[ ]" him out."[23]  And these last two-and-a-half years he has "been living in a stressful state[.]"

Although in the past, Mr. Mosha has found himself at rock bottom during tough and turbulent times, he has managed to pull himself out of the despair and anguish filled self-loathing state this case initially brough upon him.  He copes by not only spending as much time with his children as he can, but also by purusing his passions for building businesses.  Together with his wife he has started an online public relations business.  Most recently, Mr. Mosha and his wife have endeavored to revived America's oldest Russian-language newspaper named "Novoe Russkoe Slovo".  The publication, which started in 1910, previously went bankrupt, with Mr. Mosha taking it upon himself, with the help of volunteers, to bring back this back one of the most recognized and respected Russian-language media outlets. Notwithstanding any prohibitions, Mr. Mosha has no intentions on ever working in the immigration field ever gain.  *See, e.g., United states v. Olis*, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006); *United States v. Gaind*, 829 F.Supp. 669, 671 (S.D.N.Y. 1993); *United States v. Virgil*, 476 F.Supp.2d 1231, 1235 (D.N.MM. 2007); *United States v. Samaras*, 390 F.Supp.2d 805, 809 (E.D. Wis. 2006).

In all, the conduct Mr. Mosha openly and candidly accepted responsibility for is not emblematic of his character.  He is much more than just the allegations that bring him before this Court.  Instead, they are a Scarlet Letter he must now bare.  He

---

[23] Mosha Sergey Igorevich letter.

understands the grief and humiliation from the instant charges extend way past him and onto all of the people who are closest to him in this world.  Above all else, he feels he has let everyone, including himself down.  His remorse is genuine and cannot be overstated.  As these proceedings conclude, Mr. Mosha intends on continuing to live his life as the person the people closest to him believed him to be.

### C.  MOSHA'S MENTAL HEALTH WARRANTS A DOWNWARD VARIANCE

Mr. Mosha has a long history of mental health issues.  He has experienced mood swings dating back to his early adult hood, first feel into a "deep depression" in 2009, stemming from the persecution he faced in Russia prior to him finding asylum in the United States.  PSR, ¶ 101, 104.  Two years later, in 2011, Mr. Mosha began experiencing depression symptoms again, this time including severe chest and abdominal paid.  PSR, ¶ 102.  The COVID 19 pandemic brought with it, aside from all of the other unprecedented feelings experienced by all, an aggravated depressive state for Mr. Mosha wherein he was unable to eat, sleep, ████████████████████.  PSR, 102. And, expectedly, the instant arrest and ensuing criminal prosecutor has exacerbated his mental state.  PRS, ¶ 104.  ████████████████████

████████████████████████████████

████████████████████

These mood swings, depressive episodes, ████████████████ have let multiple mental health professionals to diagnose Mr. Mosha and corroborate one another.[24]  Dr. Baranovsky diagnosed Mr. Mosha as suffering from "borderline,

---

[24] The underlying medical records are available for this Court's review upon request.

depressive and dependent disorder, as well as adjustment disorder, unspecified on Axis I, and diagnosis deferred on Axis II." PSR, 102. Dr. Pilman's evaluation reflected that Mr. Mosha's abrupt change in emotional state is consistent with bipolar disorder. PSR, ¶ 104. Dr. Pilman explained that explained that Mr. Mosha has "episodes of elated mood that can last up to three but," but that "hypomanic episodes [are] followed by depression, which can last three months." PSR, ¶ 104. Mr. Mosha is prescribed several medications to help stabilize his mood. *Id.*

In sentencing Mr. Mosha, this Court may consider his mental conditions and need for certain medical care when determining the sentence, it believes to be appropriate. 18 U.S.C. § 3553(a)(2)(D) (mandating consideration of "the need for the sentence imposed. . . to provide the defendant with . . .medical care, or other correctional treatment in the most effective manner"); *see United States v. Powell*, 576 F.3d 482, 499 (7th Cir. 2009) (instructing sentencing court to consider defendant's arguments about his physical infirmities and advanced age). The guidelines provide a policy statement, § 5H1.3, that provides that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." In certain cases, "a downward departure may be appropriate to accommodate a specific treatment purpose." *Id.*

Mr. Mosha's significant mental health concerns are neither a defense to the alleged crime or an excuse for commit it. Instead, without giving rise to a legal

defense or a formal departure, it does focus the lens through with this Court should assess certain factors in § 3553(a). Aside from Mr. Mosha's "personal history and characteristics", it should also be view within the framework of "just punishment for the offense" under § 3553(a)(2)(A) requires considering Mr. Mosha's mental state as a mitigation factor. *See, e.g. United States v. Roach*, 00 CR 411 (Memorandum Opinion and Order, August 22, 2005). As the Seventh Circuit suggested in *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005), "'just punishment' also includes the concept of retribution – which, considered fairly, requires an assessment of the relative culpability of the offender – and may also include the concept of deterrence and rehabilitation, both of which may depend in part on the offender's personal characteristics." *Id.*, pg. 6; *see also, United States v. Garza-Juarez*, 992 F.2d 896, 913 (9th Cir. 1993) (where d convicted of sale of guns and possession of silencers, court departed downward under §5H1.3 where D suffered from panic disorder and agoraphobia).

Surely, Mr. Mosha should be viewed differently, in justice and fairness, then an individual who committed an equally serious offense without an underlying mental health disorder. It would certainly benefit Mr. Mosha for this Court to see to it, there be a mental treatment mandated as part of any non-custodial sentence, with any necessary treatment. Mr. Mosha has already been in therapy during the pending pretrial release. The record in this matter gives rise to a compelling reason to allow Mr. Mosha to continue his treatment and continued prescription regime crucial to maintain his mental health and risking reoccurrence of any sort of aberrant behavior.

**D. COLLATERAL CONSEQUENCES OF CONVICTION AND SENTENCE**

As a non-citizen, Mr. Mosha's "very future hangs in the balance." *Adelson*, 441 F.Supp.2d 506. That is why his immigration attorney urges this Court to consider his immigration status in sentencing him[25].  Under 18 U.S.C. § 3553, a sentencing court may appropriately consider the prospect of deportation and the consequences it will have on a defendant and their family.  *Pepper*, 562 U.S. 476 (in considering the § 3553 factors the sentencing court may entertain a broad analysis and rely on considerations the guidelines disallow); *see e.g., Brown v. United States*, No. 10 Cv. 2012, 2010 WL 5313546, at *1 (E.D.N.Y. December 17, 2010); *see also United States v. Sanchez*, 433 F. App'x 44, 45 (2d Cir. 2011) (sentencing court correctly reviewed § 3553(a) factors, including "argument that deportation would punish him").  Indeed, the Second Circuit has specifically held that "a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant," in determining "what sentence is sufficient, but not greater than necessary[.]" *United States v. Thavaraja*, 740 F.3d 253, 263 (2d Cir. 2014); *see also, United States v. Chin Chong*, 2014 WL 4773978, at *13 (E.D.N.Y. Sept. 23, 2014) ("Critical to the determination of an appropriate sentence is the likelihood that [the] defendant will be deported as a result of his conviction. . .Even without a lengthy term of incarceration, [the] defendant will be. . .punished for his wrongdoing by his expulsion from the United States"); *United States v. Ngatia*, 477 F.3d 396 (7th Cir. 2007) (deportability may justify a shorter sentence); *United States*

---

[25] Exhibit B – Mikhail Usher, Esq. letter.

*v. Farouil*, 124 F.3d 838, 847 (7th Cir. 1997) (even pre-*Booker* a defendant's status as a deportable alien can be considered in deciding whether to depart from the Guidelines).

Mr. Mosha is in a difficult position because is not a naturalized United States citizen. He came to the United States seeking asylum after experiencing active threats and constant harassment from government officials due to this human rights activities and opposition to the oppressive Russian leadership. He has lived in this country since 2011, starting a family with two daughters. His entire life is in the United States, while the threat to his well-being still exists should he be removed or deported.

If Mr. Mosha's conviction is considered an aggravated felony, which it likely will be due to the nature of the charge, upon completion of his sentence, he will be placed into removal proceedings. *Id*. Still, giving Mr. Mosha a sentence of less than one year would go a long way to mitigate the risk of having him be unable to seek various types of relief in Immigration Court." *Id*. "While Mr. Mosha needs a sentence of less than one year incarceration to avoid permanent deportation, there is no guarantee that he will be able to obtain the [necessary] immigration benefits. . .if he receives a sentence below one year. In this regard: a sentence of non-incarceration or probation is crucial to Mr. Mosha as if he spends a consecutive 180 days in custody. . .he will be ineligible for various other types of relief from deportation." *Id*.

This would be devastating not only to Mr. Mosha, but his entire family,

especially his two daughters.  Both were born here in the United States, ███████████

███████████████████████████████████████████████  His wife is a

naturalized citizen with both of her parents living here.  Given the situation in

Russia, there is a good chance that not only will Mr. Mosha's well-being be at risk,

but that he may never see his wife or either of his daughters ever again.  Not only

does this rightfully terrify Mr. Mosha, but it puts his family in a terrible position.

Their choices would be to either stay in the United States and live their lives without

a husband and father or move back to Russia with him where their lives would be in

danger as well.  It is a lose-lose situation that has been weighing heavily on Mr.

Mosha.  All of this can be, and should be, properly considered by this Court in

determining Mr. Mosha's sentence.

While there is no guarantee that any sentence would give Mr. Mosha the

immigration                relief                he                seeks,                a

sentence of non-incarceration would have an extremely positive impact on" the

immigration court's discretionary "analysis", as it will consider this Court's sentence

disposition in making its determination.  *Id.*  In contrast, "any jail sentence would

trigger ICE apprehending him after the completion of his time in prison and thus

place him in a precarious situation of being in removal/deportation proceedings."  *Id.*

Accordingly, the forgoing collateral consequences of Mr. Mosha's conviction, and

disastrous consequences of any imprisonment, should be considered at his

sentencing.

E.  RECIDIVISM AND DETERRENCE

Mr. Mosha will never commit another crime.  As a forty-seven-year-old non-violent offender, with a significant role in his family, a long history of employment, no criminal history or any prior terms incarceration, and full acceptance of responsibility including full repayment of forfeiture by the time of sentencing, among other things, there is nothing to suggest that Mr. Mosha poses any threat or risk of committing another criminal offense.  *See United States v. Roth*, No. 05 CR 792-5, 2008 U.S. Dist. LEXIS 19603, at *7 (N.D. Ill. Mar. 11, 2008 (departing downward to sentence of probation where defendant posed no risk of recidivism based on lack of criminal history). The past two-and-a-half years have weighed heavily on Mr. Mosha. The emotional tolls the the instant proceedings have taken on him, and more importantly his family, are tremendous and cannot be overlooked.

Aside from the immigration consequences he will face, the embarrassment surrounding the current conviction is enough to deter him from any future criminal acts.  To Mr. Mosha, the shame and embarrassment surrounding the current conviction is enough to deter him from any future criminal acts.  *See United States v. Edwards*, 595 F.3d 1004, 1015-17 (9th Cir. 2010) (upholding below guidelines sentence of probation for bank fraud, a downward variance from a guideline range of 27-33 months, because the sentencing judge adequately addressed the § 3553(a) factors finding that he did not pose a threat of recidivism despite a previous felony conviction for a similar offense, a term of imprisonment was not needed for specific or general deterrence, and the defendant did pose a threat to the public from re-

offending).

Undoubtedly, Mr. Mosha deeply regrets the poor decisions he made which landed him before this Court. Although hindsight is always twenty-twenty, Mr. Mosha knows that what he gained from committing the instant offense, especially considering the tolls the consequences of his actions have had on him and his family, was not worth it. To that end, there is no need for specific deterrence in this case. Mr. Mosha does not need to be confined. He is not dangerous. He will not commit any offenses in the future. He is genuinely remorseful and committed to staying a law-abiding citizen and valuable member of society.

Even if Mr. Mosha is spared prison, he has already suffered tremendous personal consequences because of his conduct. He is afraid of losing his immigration status and may face an uphill battle in Immigration Court. At risk is everything – his family and his life in the United States. These tremendous personal consequences will likely deter other similarly situated defendants from potential criminal activity. More so, Mr. Mosha will suffer the stigma and collateral consequences of being a convicted felon for the rest of his life. Even if he is ultimately allowed to remain in the United States, he will still suffer restrictions on travel, banking, employment, housing, benefits, among many more. *Wachowiak*, 496 F.3d at 747 (substantial deviation from guidelines appropriate in child pornography case given the collateral consequences suffered by the defendant, including loss of his career as a music teacher and his forced resignation from numerous other jobs); *see also United States v. Nesbet*h, No 15-CR-18(E.D.N.Y. May25, 2016) (drug defendant sentenced to

probation despite guideline range of 33-41months' imprisonment based in part on "nearly 50,000 federal and state statutes"). Here, deterrence can be satisfied by a period of supervised release with conditions that otherwise restrict Mr. Mosha's freedom, while at the same time giving him the opportunity to potentially fight his immigration matter, maintain lawful employments, and stay in the United States with his wife and two children.

Mr. Mosha has demonstrated as such with his conduct while on home detention awaiting sentencing. For well-over two years, Mr. Mosha has been on home detention, which is in-and-of itself a restrain on liberty that is not considered within a guideline determination. *United States v. Baker,* 502 F.3d 465 (6th Cir. 2007) (where defendant pled guilty to possession of unregistered firearm arising from altercation with wife during which gun accidentally discharged and guideline range 27-33 months, below-guideline sentence of probation with one year house arrest proper in part because he behaved "exceedingly well" while under supervision of pretrial services).

It is no secret that Mr. Mosha is a well-known and once-respected member of the greater Russian-speaking community both domestically and abroad. He has lawfully helped countless individuals, as well as companies, from all walks of life, throughout his career. He dedicated his time, money, and resources to helping both friends and strangers alike with no expectations of any form of recognition. For those reasons this Court should also consider Mr. Mosha's loss of reputation as a substantial portion of his punishment. And as courts have routinely recognized in

the past, losing your good name is a significant punishment. *United States v. Libby* ("**t**he reputation he gained through his years of public service and professional work in the legal community is forever damaged [and where] the consequences of his felony conviction on his former life as a lawyer, public servant and private citizen will be long-lasting."); *United States v. Adelson* 441 F.Supp.2d 506 (SDNY 2006) ("With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct.").

And felony conviction is, in and of itself, a devastation that will be carried with Mr. Mosha for the rest of his life and will, no doubt, overshadow all the positive contributions he has made throughout his life. *See, e.g, United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant"); *United States v. Smith,* 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive.").

Mr. Mosha is also mindful that this Court must consider general deterrence. However, this is not a factor that the Court must consider mechanically. *United States v. Molton*, 743 F.3d 479, 486 (7th Cir. 2014) (recognizing that sentencing judges "should consider general deterrence but must also hand down an 'individualized sentence'")(*quoting Gall*, 522 U.S. at 50); *see also United States v. Brubaker*, 663 F.2d 764, 769 (7th Cir. 1981)("Consideration of general deterrence is proper provided it does not result in a mechanistic imposition of a sentence"). And while the effective deterrence of other crimes may generally require "a credible threat of imprisonment,"

that objective "does not necessitate imprisonment in every case." *United States v. Warner*, 792 F.3d 847, 861 (7th Cir. 2015); *see also United States v. Hill*, No. 15-3090 (7th Cir. April 7, 2016) ("There is potentially substitutability between prison and the conditions [of supervised release]. Both types of punishment restrict the defendant's freedom"). To that end, general deterrence in the instant matter would be satisfied by a non-custodial sentence. *United Stats v. Kappes*, 782 F.3d 828, 836 (7th Cir. 2015) (well-tailored supervise release condition "serve the purposes of deterrence, rehabilitation and protection of the public").

It is clear from his personal and family history, and the potential immigration consequences that have haunted him for several years, that Mr. Mosha will not engage in unlawful behavior in the future – one of the primary factors, which must be considered, under § 3553(a). According to § 3553(a)(2), an appropriate sentence should "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." While a sentence must reflect the seriousness of the offense and provide for adequate deterrence, the effect on Mr. Mosha resulting from his conviction will ensure that the purposes of sentencing, deterrence, and respect for the law will still be fully vindicated if this Honorable Court imposes a non-custodial sentence. Such a sentence would not deprecate the seriousness of the offense and would provide adequate specific and general deterrence. *See Gall*, 552 U.S. at 54. The limitations put forth by a non-custodial sentence, in conjunction with the significant collateral consequences of a federal felony conviction will suffice to not only deter Mr. Mosha from future crimes but will serve as a deterrent to all potential

24

offenders.

### F. A Non-Custodial Sentence Will Be Just Punishment

This Court is inherently tasked with an incredibly difficult decision as to what a just punishment is for any given defendant. *Adelson*, 441 F.Supp.2d at 515 ("[I]t is obvious that sentencing is the most sensitive, and difficult, task that any judged is called upon to undertake."). While the sentencing guidelines work as a benchmark in sentencing, on their face, they fail to accurately illustrate the reality of the crime of conviction. Mr. Mosha is subject to an advisory sentencing range of 12 to 18 months' imprisonment. A custodial sentence in this case would not only be harsh, especially given the potential collateral consequences Mr. Mosha, but will be greater than necessary to achieve the purposes of sentencing. Although clearly serious, the instant offense does not involve the use of violence, the possession of weapons, or the distribution of drugs. Mr. Mosha is not dangerous and does not pose a threat to society. And while he makes no effort to deprecate the seriousness of the offense and understands the need for retribution, an appropriate, reasonable, and sufficient sentence in this case is non-custodial.

The goal of sentencing is to impose a sentence that is sufficient, but not greater than necessary to comply with the purposes set forth in § 3553(a)(2). Through this "parsimony provision," the Court is to impose a sentence that is the *minimum* necessary to accomplish those goals set forth in paragraph (2). As a first-time felony offender whose crime, although serious, was non-violent in nature, a non-custodial sentence would, without a doubt, meet the goals of sentencing. *See* 28 U.S.C. § 994(j),

*amended (this section unaffected)* by PL 11-273, Oct. 12, 2010, 124 Stat 2858 (probation is an appropriate sentence for "cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," reserving imprisonment for "a person convicted of a crime of violence that result[ed] in serious bodily injury").

In reaching a fair and just sentencing for Mr. Mosha, this Court must consider, *inter alia*, that a non-custodial sentence is in no way a free pass and sufficiently exemplifies punitive consequences and significant restrictions. *See Gall,* 552 U.S. at 47-48*; quoting United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (internal citations omitted)).  There is no shortage of cases in which courts have significantly varied from advisory guidelines in sentencing a non-custodial sentence.  *See supra (Subsection F: Unwarranted Sentencing Disparities)*; *see also, Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) ("To a greater or lesser degree, it is always true of probationers (as we have said it to be true of paroles) that they do not enjoy the 'absolute liberty to which every citizen is entitled, but only. . .conditional liberty properly dependent on observance of special [probation] restriction.'") (internal quotation omitted); *United states v. Tolla*, 781 F.2d 29, 35 (2d Cir. 1986)("[P]robation itself contains elements of punishment in the restraints imposed upon the freedom of the individual. . ."); *United States v. Diambrosio*, No. 04—66, 2008 WL 732031, at *5 (E.D. Pa. Mar. 13, 2008)("A probationary sentence would significantly limit Defendant's liberty and impose restriction on his activities

while allowing him to continue supporting his family and paying his substantial restitution obligation."); *cf. United States v. Zimmerman*, No. 10-CR-598, 2012 WL 3779387, at *6 (E.D.N.Y. June 19, 2012)("Imprisonment is not the only way we punish.  Supervised release brings with it a serious of significant restriction on a defendant's liberty. . .Imprisonment concededly a more onerous form of punishment, and different in kid from supervision, but [the defendant] is being punished.").[26]

The Supreme Court has made clear that a non-custodial sentence is not "an act of leniency, [but] a substantial restriction of freedom." *Gall*, 552 U.S. at 44; *Warner*, 792 F.3d at 861 (affirming that probation was a "sufficiently serious sentence"); *United States v. Coughlin*, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1 2008) (noting that, among other things, probation "can be [a] severe punishment[ ], hugely restrictive of liberty, highly effective in the determent of crime and amply retributive," and that "[n]ot all defendants must be sentenced to imprisonment to be duly punished"); *see also*, 28 U.S.C. § 994(j) (Congress stressed "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense").

In consideration of such a sentence, this Court has the authority to enter a community service order, which would further satisfy the goals of sentencing.

---

[26] Notably, non-custodial sentences have been upheld as reasonable even when the defendant was facing Guidelines greater than 12-18 moths as is called for by the guidelines in this case. *See, e.g., United States v. Ross*, 351 F. App'x 626, 627 (3d Cir. 2009) (affirming a five-year probationary sentence-including twelve months home confinement-where the Guideline range was 51-63 months incarceration); *United States v. Whitehead*, 532 F.3d 991, 992-93 (9th Cir. 2008) (affirmed a sentence of five-years' probation, 1000-hours community service an $50,000 in restitution where the Guidelines range was 41-51- months incarceration).

Community service has long been recognized as a "burdensome penalty that meets with widespread public approval, is inexpensive to administer . . . produces public value . . . and . . . can to a significant extent be scaled to the seriousness of crimes." *Intermediate Sanctions in Sentencing Guidelines*, National Institute of Justice, May 1997. The United States Probation and Pretrial Services department have long agreed with such a recommendation, as "[c]ommunity service addresses the traditional goals of punishment, reparation, restitution, and rehabilitation. . . It restricts offenders' personal liberty. . . allows offenders to atone or 'make a victim whole' in a constructive way. . . [and] may be regarded as . . .a form of symbolic restitution[.]" *Court & Community: An information Series About U.S. Probation & Pretrial Services: Community Service*, Office of Probation and Pretrial Services, Administrative Office of the U.S. Court, 205 (http://www.uscourts.gov/misc/revision-community.pdf).

This Court can further promote and strengthen the punishing nature of a non-custodial sentence by including a term of home confinement. This condition serves as an additional limitation of Mr. Mosha's freedom and liberty by prohibiting him from leaving this home except for work, medical appointments, childcare, or religious services. Strict supervision and home confinement will serve as a necessary deterrent for Mr. Mosha while also having a sufficing punitive component to dissuade recidivism.

Mr. Mosha is not a violent or a serial career criminal who poses a dangerous threat to society. He is a 47-year-old first time offender who readily accepted

responsibility for his action. For over two years, Mr. Mosha's entire life has been consumed by his wrongdoings, the ripple-effects of which have been felt dearly by the ones closest to him. While retribution is warranted in the instant matter, a term of imprisonment will deviate beyond the purposes of sentencing. A federal conviction and the immigration consequences that he may face are, in and of themselves, devastations that will be carried with Mr. Mosha for the rest of his life and will, no doubt, overshadow all the positive aspects of his life from before, and now after, the instant matter has concluded. Here, a jail sentence is not necessary to promote Mr. Mosha's respect for the law, as it can clearly be seen that the consequences of his conduct will stay with him for the rest of his life. He will forever be branded a convict.

No matter the sentence, there will be a permanent and profoundly negative impact on Mr. Mosha's life and freedom. The stigma carried by a federal felony conviction blights a person's life, forever. There are no shortages of limitations placed upon an individual's life, many of which have already manifested in Mr. Mosha's, including social stigma, psychological impact on the defendant and their family, along with the curtailment of even the most basic freedoms. Given the situation, a non-custodial sentence will not only adequately reflect the individualized assessment of the case and promote respect for the law but will also provide just punishment.

## CONCLUSION

This Court maintains significant discretion to not only craft a reasonable, appropriate sentence pursuant to the Guidelines, but to consider the totality of circumstances surrounding the individual involved, including, his unique personal

history, his mental health concerns, and the potential collateral consequences of his actions, among all the other aspects of sentencing discussed above. The foregoing considerations outlined in this submission only show a small portion of who Mr. Mosha really is: a loving and dedicated father, husband, friend, and businessman who has persevered through many of life's hurdles. The conduct that placed him before this Court was not driven by any sort of evil malice; it was not motivated by any sort of malevolence or other ulterior motive. Rather, it was a series of stupid decisions that have already, and will continue to, adversely affect the rest of his and his family's life. In sentencing Mr. Mosha to a non-custodial sentence, this Court would accomplish the goals of sentencing by punishing the individual – not the crime – to a sentence that is sufficient, but not greater than necessary. *See Pepper*, 131 S.Ct. at 1240.

Respectfully submitted,


*/s Vadim A.Glozman*
*Attorney For Yury Mosha*

Vadim A. Glozman
LAW OFFICES OF VADIM A. GLOZMAN
53 W. Jackson Blvd., Suite 1128
Chicago, IL 60604
(312) 726-9015
vg@glozmanlaw.com