

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 26, 2023

**BY ECF AND EMAIL**
The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

**Re:**   *United States* v. *Yury Mosha*, 21 Cr. 92 (JPO)

Dear Judge Oetken:

The defendant in this case, Yury Mosha ("Mosha" or "the defendant"), is scheduled to be sentenced on June 2, 2023, at 12:30 p.m., having pleaded guilty to Count One of Indictment 21 Cr. 92 (JPO) (the "Indictment"), which charged Mosha with conspiring to defraud the United States and commit immigration fraud, in violation of Title 18, United States Code, Section 371. Pursuant to a plea agreement between the parties, the stipulated United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range is 12 to 18 months' imprisonment (the "Stipulated Guidelines Range"). For the reasons below, the Government submits that a sentence within the Stipulated Guidelines Range is warranted in this case.

## Background

### Background on the Asylum Process

As the Court is well aware from the trial of Mosha's co-defendants, Uladzimir Danskoi and Julia Greenberg, and its stewardship of this case, pursuant to federal immigration law, to obtain asylum in the United States, an alien is required to show that he or she has suffered persecution in his or her country of origin on account of race, religion, nationality, political opinion, or membership in a particular social group, or has a well-founded fear of persecution if he or she were to return to such country.

Alien applicants seeking asylum are required to complete and present a form, Form I-589, to United States Citizenship and Immigration Services ("USCIS"). The Form I-589 requires a detailed and specific account of the basis of the asylum claim. Alien applicants are permitted to append to the Form I-589 an Asylum Affidavit—a personal history statement, providing greater

Hon. J. Paul Oetken                                                                                      Page 2
May 26, 2023

detail about the applicant's background and basis for seeking asylum. Applicants are further entitled to include relevant documentation supporting their claim for asylum. If the Form I-589 is prepared by someone other than the applicant or a relative of the applicant, such as an attorney, the preparer is required to set forth his or her name and address on the form. The alien applicant and preparer are required to sign the petition under penalty of perjury. The alien applicant must typically apply for asylum within one year of his or her arrival in the United States.

After the Form I-589 is submitted, the alien applicant is interviewed by an Asylum Officer to determine whether the applicant qualifies for asylum (the "Asylum Interview"). At the Asylum Interview, the applicant is permitted to speak on his or her own behalf, and can present witnesses or documentation in support of his or her asylum claim. Asylum applicants are entitled to have an immigration lawyer present for their Asylum Interview, and often avail themselves of this right. At the conclusion of the Asylum Interview, the attorney is usually given an opportunity to provide supplemental or clarifying information, to make a statement on behalf of the applicant, and/or to answer questions or concerns posed by the Asylum Officer. After the Asylum Interview, the Asylum Officer determines whether the alien applicant qualifies for asylum.

If an alien applicant is granted asylum, he or she receives a completed Form I-94 that reflects that USCIS has granted him or her asylum status. The grant of asylum typically applies to the applicant's spouse and children as well. An alien who has a Form I-94 can apply for, among other things, lawful permanent resident status. A grant of asylum status does not expire, although USCIS can terminate asylum status if, among other things, it is later discovered that the applicant obtained asylum through fraud or no longer has a well-founded fear of persecution in his or her home country.

If the Asylum Officer determines that the applicant is ineligible for asylum status, and if the applicant is in the United States illegally, the matter is referred to an Immigration Judge at the Executive Office for Immigration Review. The Immigration Judge holds a hearing during which the alien applicant, and commonly an immigration lawyer, appear before the Immigration Judge and present evidence in support of the asylum application (the "Asylum Hearing"). For asylum applicants residing in the Southern and Eastern Districts of New York, all immigration hearings take place in Manhattan, New York. After the Asylum Hearing, the Immigration Judge renders a decision on the alien's asylum application.[1] If the Immigration Judge denies the asylum application, the applicant may appeal that decision to the Board of Immigration Appeals ("BIA"). If the applicant loses his or her appeal before the BIA, the applicant may appeal to a federal court.

A successful application for asylum generally requires, among other things, that: (a) the applicant submit his or her application within one year of his or her last arrival in the United States;

---

[1] Because the determination of the legitimacy of an asylum applicant's "application" includes both an assessment of the written Form I-589 as well as the applicant's performance in a subsequent Asylum Interview and/or Asylum Hearing, references herein to the "asylum application" (or "application") refer to the combination of the Form I-589 and in-person proceedings (*i.e.*, Interview and Hearing). References to the "Form I-589," the "Asylum Affidavit," and/or "Supporting Documents," on the other hand, will exclusively relate to the applicant's written submission(s) to USCIS.

(b) the applicant demonstrate that he or she is a "refugee," meaning, in general terms, that he or she is unable to return to his or her country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion; (c) the applicant subscribe to the assertions contained in his or her application for asylum under penalty of perjury; and (d) the applicant be interviewed, under oath, by an asylum officer.

Pursuant to federal immigration law, aliens can obtain an "L-1 visa," which allows for temporary authorization to work in the United States if they can establish that they have been working for a qualifying organization abroad either that they are seeking to enter the United States to provide services in an executive or managerial capacity for, or alternatively in a specialized knowledge capacity to, a branch of the same employer or one of its qualifying organizations. Typically, an alien's employer completes and presents a form, Form I-129 ("Petition for a Nonimmigrant Worker"), to USCIS on behalf of the alien seeking the employment authorization (the "Beneficiary"), which can append any relevant information providing greater details about the Beneficiary's employment history and basis for seeking an L-1A or L-1B visa, including by providing relevant documentation supporting their request. The Petitioner and Preparer (if any) are required to sign the petition under penalty of perjury. The determination of whether to grant an L-1A or L-1B visa is typically made by the State Department.

<u>Investigation Into Russian America</u>

The investigation revealed that Yury Mosha (the "defendant"), his co-defendants—including Danskoi, Greenberg, Aleksei Kmit, Kateryna Lysyuchenko, Tymur Shcherbyna—and others, known and unknown, conspired to provide certain applicants and potential applicants for legal status with assistance in making and supporting fraudulent claims for asylum, including through Form I-589s, Asylum Affidavits, Supporting Documents, Asylum Interviews, and Asylum Hearings, with the objective of receiving a completed Form I-94. Among other things, they helped applicants and potential applicants to (i) concoct false and fraudulent bases that would purport to satisfy the above-mentioned criteria for asylum, (ii) generate fraudulent evidence that purported to support those false and fraudulent assertions, (iii) prepare and submit Asylum Applications, Asylum Affidavits, and Supporting Documents containing the false and fraudulent assertions, and (iv) prepare for and accompany applicants to Asylum Interviews and Asylum Hearings at which the applicant would reiterate the false and fraudulent assertions. Mosha and Danskoi also discussed ways in which they could fabricate applicants' bases for procuring L1 visas, which are certain visas permitting aliens to work in this country.

The investigation into the defendants was prompted, in part, by several sources who collectively informed the investigating agencies—the Federal Bureau of Investigation ("FBI"), the Department of Homeland Security—Homeland Security Investigations ("HSI"), and USCIS—that both Mosha and Danskoi, who ran Russian America's Manhattan Office and Brooklyn Office, respectively, were engaged in immigration fraud. The investigation included the use of a cooperating witness ("CS-1") and two confidential sources (referenced in the Superseding Indictment as "CS-2" and "CS-3") (collectively, the "Confidential Informants" or "Sources") who, at the instruction of law enforcement, conducted a sting investigation into the defendants and their associates. As part of that investigation, CS-1 and CS-2 each worked with Mosha and Mosha's

Hon. J. Paul Oetken                                                                                              Page 4
May 26, 2023

associates at the Manhattan Office, and CS-3 worked with Danskoi at the Brooklyn Office; both CS-1 and CS-3 also ultimately worked with Lysyuchenko and Greenberg.

The Sources each presented themselves as aliens who were visiting the United States on travel visas, but each looking to live here permanently without any valid legal basis to do so. In each case, one or more of the defendants encouraged the Sources or assisted them in concocting and/or presenting false bases for asylum, through the written Form I-589 application and supporting Asylum Affidavit and documentation and/or in advance of and during the Sources' Asylum Interviews with a USCIS Asylum Officer.

**CS-1**

In August 2018, CS-1 met with Mosha and indicated that CS-1 was a Ukrainian national who wished to remain in the United States. CS-1 failed to state any legitimate basis for asylum, such as alleging that CS-1 suffered persecution while living in Ukraine. Mosha encouraged CS-1 to create a blog that was critical of the Ukrainian Government, and Mosha promised to promote the blog on his popular YouTube channel[2]; in doing so, CS-1 would *generate* a basis for asylum by claiming that CS-1's blog made it unsafe for CS-1 to return to Ukraine. As Mosha explained, in substance and in part, "you will be proving that you will be persecuted in the future because they kill bloggers and journalists there for real." Mosha also instructed CS-1 to blog for several months before applying for asylum so that it would appear to immigration authorities as if CS-1 *first* had the idea to blog and *then* made the decision to seek asylum, as opposed to blogging as a *means* to obtain asylum. Mosha also referenced other Russian America clients who successfully sought asylum this way, even joking and laughing about one, "Sergey," who stopped blogging after obtaining asylum (evincing his knowledge that the sole purpose of blogging was to create a basis for asylum). When CS-1 indicated that he lacked the technical, journalistic, or subject-matter knowledge to maintain and write a blog, Mosha put CS-1 in touch with Shcherbyna, a Ukraine-based blogger who agreed to—and did—ghost-write CS-1's blog in exchange for money. In the following weeks, CS-1 made clear to Mosha and Kmit that Shcherbyna was writing CS-1's blog on CS-1's behalf.

Mosha also connected CS-1 with Lysyuchenko, an Italy-based "journalist," to help CS-1 write CS-1's Asylum Affidavit. Despite making clear to Lysyuchenko that CS-1 had no legitimate basis for asylum—both by admitting that that CS-1 was never persecuted in Ukraine and because he was having someone else ghost-write his blog—Lysyuchenko agreed to help CS-1 with CS-1's Affidavit. Among other things, Lysyuchenko sent CS-1 a series of Asylum Affidavit templates to use as models, including one for a blogger. Over several weeks, Lysyuchenko, Kmit, and an unnamed attorney,[3] reviewed multiple iterations of CS-1's draft Asylum Affidavit and provided

---

[2] A valid claim of asylum based on political opinion is predicated on one's native Government being aware of the blog. By agreeing to promote the blog, Mosha would allow CS-1 to more convincingly claim that the Ukrainian government was aware of it.

[3] CS-1 was informed that one or more iterations of CS-1's Asylum Affidavit were being forwarded to "the attorney," who in turn provided feedback about areas of the affidavit that were insufficient, and required additional information in order to pass muster with USCIS.

Hon. J. Paul Oetken  Page 5
May 26, 2023

guidance on necessary substantive changes and additions in order for CS-1 to present a passable Affidavit. Over time, CS-1's Asylum Affidavit changed in several material respects. For example, in an initial iteration of the draft, CS-1 claimed that CS-1 had no real interest or activism in politics, and that he did not feel affected by Ukrainian politics, before traveling to the United States (and that CS-1 only began paying attention to Ukrainian politics after he arrived in the U.S., at which point he began posting blogs critical of corruption in Ukraine). By the fourth and final iteration of the Asylum Affidavit—which was ultimately submitted to USCIS as part of CS-1's Asylum Application—at the prompting of Lysyuchenko and others, CS-1 claimed that he was actively involved in Ukrainian politics since he was a child and that he had long wanted to become a journalist. Similarly, CS-1's initial draft indicated that he was involved in two incidents in which he was mildly harassed for being a Russian-speaking Ukrainian: (1) an alleged incident in August 2008, when CS-1 was 15 years old and walking with friends in Kharkiv, Ukraine, whereupon a group of people asked why they were not speaking Ukrainian, and called them a degrading name ("vatniki") until a group of policemen passed by and helped CS-1 and his friends (the "2008 Incident"), and (2) an alleged incident in 2016, in which CS-1 and his friends were at a hookah bar in downtown Kharkiv when a group of Ukrainian-speaking individuals knocked over CS-1's hookah and called them a humiliating name ("valenki," *i.e.*, stupid hicks) until the manager of the bar came to the defense of CS-1 and CS-1's friends, kicked-out the Ukrainian speaking aggressors, apologized to CS-1 and his friends, and bought them a round of drinks and a new hookah (the "2016 Incident"). However, by the fourth and final version of the Asylum Affidavit, both incidents were altered in material ways. Regarding the 2008 Incident, the final version of the affidavit provided greater detail and claimed that:

> Policemen walked by and asked what was going on. These policemen were speaking Russian and we thought that they would help us. The group of drunk guys said that everything was OK because we were just stupid "vatniki." The policemen then asked us something in Ukrainian, but we did not understand them and could not answer. They started laughing and also yelling at us and calling us "vatniki." It became clear that they would not help us. They just walked away when they were called on the radio. I was afraid that if they had not been called, we would have been arrested. The drunk guys also got bored and finally left.

Similarly, the recounting of the 2016 Incident dramatically changed. In the final iteration, instead of being rescued by the manager of the hookah lounge, CS-1 and his friends were kicked out of the bar by the manager, at which point they were followed by the Ukrainian-speaking aggressors and beaten to the point of unconsciousness:

> By that time the manager saw what was happening and came up to us. After the manager talked to that group, he told us to leave. We could not understand why we had to leave. The manager told us that only Ukrainian was allowed to be spoken in the bar and he did not want to have "valenki" such as ourselves there. We decided to leave to avoid a conflict. We did not notice at first that that group of guys followed us outside. We tried to run away. I was not fast enough, and soon three guys caught me and started to violently beat me with their fists and to kick, simultaneously yelling that Ukraine was for Ukrainians and not for "valenki." I do not know, how long they were beating me. I probably fainted, because when I

finally opened my eyes, my friends were with me, and those guys could not be seen. Although it was difficult for me to walk, I wanted to file a police report right away, so that they could see how serious this incident was. Unfortunately, the police did not care. When we arrived at the police station and could not understand what they were saying to us in Ukrainian, they told us in Russian to leave. They said that if they see us again, they will arrest and beat us up.

Ultimately, in April 2019, Mosha mailed CS-1's Form I-589 Application, Affidavit, and supporting documentation—including blogposts allegedly written by CS-1 but actually written by Shcherbyna—to USCIS. The Form I-589 sought asylum both on grounds of membership in a particular social group (*i.e.*, historical persecution for being an ethnic-Russian Ukrainian) and political opinion (*i.e.*, related to the blog). Both the I-589 and the Affidavit falsely claimed that CS-1 authored his own blog, and the Affidavit included multiple falsehoods about CS-1's alleged persecution in Ukraine (including by detailing the alleged 2008 and 2016 Incidents).

On July 30, 2019, CS-1 met with Mosha to discuss his upcoming September 5, 2019 Asylum Interview with USCIS. During the meeting, Mosha coached CS-1 how to answer certain questions such as why CS-1 first began blogging in the United States in a manner designed to conceal that CS-1's only basis for blogging was to generate a basis for asylum: "He will ask why you didn't make political blogs before if you were interested in politics. 'I was afraid. I didn't know. I gained freedom here . . . I started reading and watching YouTube. I started reading the news.'" Mosha also coached CS-1 regarding the political views CS-1 should express during the Asylum Interview: "Say that practice has shown that with the change of [Ukrainian] president[s], nothing changes overall. What happened under . . . under Kuchma, there was corruption, under Yuschenko, under Yankovych, under Poroshenko. Yes, as if it is possible, something can change, but it will take many years and for now, everyone is sitting in their places." During the same meeting, CS-1 reiterated that CS-1 did not write his own blog, and indicated that CS-1 was not even reading the blogposts ghostwritten and posted by Shcherbyna "because there are already so many of them." During this meeting, Mosha indicated that Kmit would arrange for an interpreter to attend the Asylum Interview[4] and, at CS-1's request, Mosha agreed to connect CS-1 with an attorney to represent him at the proceeding.

On September 4, 2019, Mosha advised CS-1 that Greenberg would meet with CS-1 to prepare and accompany CS-1 into the USCIS Asylum Interview the following day in Beth Page, New York. Thereafter, on September 5, 2021, CS-1 met with Greenberg immediately before his interview, whereupon Greenberg helped prepare CS-1 to commit fraud during CS-1's Asylum Interview. During that meeting Greenberg was explicitly advised by CS-1 that (1) Russian America told CS-1 to start writing a blog as a basis to obtain asylum; (2) Mosha referred CS-1 to "a person" (*i.e.*, Shcherbyna) who wrote and maintained CS-1's blog on CS-1's behalf; (3) CS-1 had not even read the contents of the blogpost; and (4) Russian America repeatedly advised CS-1 that CS-1's asylum affidavit was unsuitable, and repeatedly instructed CS-1 to add details that would create a sufficient basis for persecution, prompting CS-1 to ultimately include the 2008

---

[4] In 2019, USCIS generally required that non-English-speaking asylum applicants provide their own interpreters for the Asylum Interview, though USCIS would typically also have its own interpreter also observe the proceedings.

Hon. J. Paul Oetken                                                                                                          Page 7
May 26, 2023

Incident and the 2016 Incident in CS-1's affidavit. Regarding the 2016 Incident, CS-1 informed Greenberg that an earlier iteration of CS-1's affidavit simply claimed that CS-1 was kicked out of Manhattan Bar, but that Mosha advised that this claim was insufficient, such that in the final iteration, CS-1 for the first time claimed that CS-1 was assaulted upon leaving the bar.

       In addition, Greenberg and a translator provided by Russian America coached CS-1 to defraud a USCIS Asylum Officer during CS-1's Asylum Interview. For example, when Greenberg asked CS-1 the last time that CS-1 posted on CS-1's blog, CS-1 reiterated that CS-1 did not personally write, or even read the blog. Greenberg then encouraged CS-1 to review the blog with her, so that CS-1 would be prepared to answer the USCIS Asylum Officer's questions about the blog. Greenberg and the translator also conducted a mock Asylum Interview of CS-1, where they coached CS-1 how to answer questions about CS-1's fraudulent bases for asylum. Greenberg and the translator also coached CS-1 to say that Mosha and Russian America only provided "translation services"—despite CS-1 explicitly telling Greenberg that it was Mosha, a non-attorney, who instructed CS-1 how to fabricate a basis for asylum, and that Russian America repeatedly advised CS-1 to change CS-1's asylum affidavit and to add details in order to make a more compelling case for asylum. Greenberg also coached CS-1 to state that CS-1 prepared his Asylum Affidavit by himself—without any help from Russian America—and that Russian America merely translated CS-1's Affidavit from Russian to English, despite CS-1 repeatedly telling Greenberg that this was untrue.

       During their preparation, and while role-playing as the asylum officer, Greenberg coached CS-1 to answer questions that, based on the foregoing, she understood would elicit false responses. Among other things, she asked CS-1 detailed questions about the last time CS-1 wrote in his blog (knowing that CS-1 *never* wrote the blog), and what CS-1 wrote about (again, knowing that CS-1 did not actually write the blog). Greenberg also prepared CS-1 to answer questions about the two alleged persecution incidents—*i.e.*, the 2008 Incident and the 2016 Incident.

       Thereafter, Greenberg accompanied CS-1 into the Asylum Interview, whereupon CS-1 repeated CS-1's false and detailed account, under oath, about the 2008 Incident and the 2016 Incident, and in which CS-1 repeated CS-1's lies about the reason CS-1 started CS-1's blog and about personally authoring the blog. At the conclusion of the interview, the Asylum Officer indicated he had concerns about CS-1's credibility and asked Greenberg to address them. In response, Greenberg acknowledged that the 2008 Incident was an insufficient basis for asylum but that the "latest incident" (*i.e.*, the 2016 Incident)—which Greenberg knew to be fabricated—provided a sufficient basis to grant asylum. Immediately following the interview, CS-1 paid Greenberg $1,000 in cash for her services rendered and agreed to pay the remaining $500 balance at a future time.[5]

       USCIS subsequently denied CS-1's asylum application. Despite her full awareness that CS-1's Asylum Application was based upon fraud, Greenberg agreed to continue to represent CS-1 in CS-1's bid for asylum. On or about October 16, 2019, CS-1 met with Greenberg at her law office in Manhattan, whereupon Greenberg agreed to represent CS-1 during federal immigration

---

[5] This $1,500 fee was exclusively for Greenberg's work before and during the USCIS Asylum Interview and that payment did not contemplate any future legal services thereafter.

Hon. J. Paul Oetken                                                                                                    Page 8
May 26, 2023

judicial proceedings in exchange for a $6,000 retainer agreement. At that meeting, CS-1 paid the remaining $500 outstanding debt owed to Greenberg for her services rendered at the Asylum Interview, and CS-1 paid an additional $1,500 toward his $6,000 retainer fee (with an agreement to pay the remaining balance over time).

Thereafter, on or about November 6, 2019, CS-1 met with Greenberg at 26 Federal Plaza, New York, New York, for his initial appearance in immigration court. Immediately before the proceeding, CS-1 indicated that "I'm nervous, I want this to end soon . . . [someone] told me about some guy who also made up stories like me, and to make a long story short, they caught him for it. And he got in trouble breaking the law." CS-1 inquired whether the Court would look-into CS-1's blog or if there was a change the Court would find out that CS-1's application was fraudulent. Greenberg, unfazed, responded "You will just sit and smile, I will speak." The two then proceeded into court, a perfunctory initial appearance in which the court scheduled a formal immigration hearing for November 6, 2023. Greenberg was arrested before she had the opportunity to further represent CS-1—or any other Government Source—in Court.

### CS-2

At the instruction of law enforcement, after CS-1 had been meeting with Mosha and his co-conspirators for several months, and in an attempt to further investigate the existence and scope of the asylum fraud conspiracy, and to identify additional coconspirators—CS-1 told Mosha that CS-1 had a friend from Uzbekistan (*i.e.*, CS-2) who was also interested in using Russian America's services to seek permanent status in the United States. In June 2019, CS-1 brokered an introduction between Mosha and CS-2. Much like with CS-1, and without ever inquiring into whether CS-2 had a legitimate basis for asylum, Mosha recommended that CS-2 maintain a blog critical of the Uzbek government as a means to generate a basis for asylum. When CS-2 indicated that he lacked the journalistic or technical expertise to blog, Mosha stated that he would introduce CS-2 to the same person who "wrote" CS-1's blog (thereby further evincing Mosha's knowledge that CS-1 did not write CS-1's own blog, and that CS-2 would similarly have someone ghost write CS-2's blog). Before CS-2 even created his blog, Kmit informed CS-2 that Russian America had already prepared CS-2's I-589 Asylum Application. Thereafter, in December 2019, CS-2 began communicating with Shchberyna, who agreed to ghost-write CS-2's blog in exchange for money. Mosha also connected CS-2 with a Russian America "journalist"—to help CS-2 write CS-2's Asylum Affidavit. However, CS-2 was considerably more aggressive, direct, and explicit than CS-1 about his lack of any basis for asylum. For example, when one such journalist asked CS-2 to detail why CS-2 was afraid to return to Uzbekistan, CS-2 responded, in writing, by stating, in substance, "I'm not afraid to return to my homeland. I was told that running away is the way to stay here. I don't understand what you mean." By mid-December, a Russian America associate contacted CS-2 to terminate CS-2's contract with Russian America, stating, in part, "we looked at your case with a lawyer, that is, what is available now, and unfortunately the lawyer says that the case is very weak, and that we cannot work with it." Based on the Government's investigation, we understand that Russian America was concerned that CS-2 might be a Government source, and terminated its agreement with CS-2 to avoid criminal exposure.

**CS-3**

As the Court will recall from trial of Mosha's co-defendants, starting in August 2019, CS-3 began working with Danskoi at Russian America's Brooklyn Office. With Danskoi, Greenberg, and Lysyuchenko's assistance, CS-3 sought asylum on the fraudulent basis that he was persecuted in Ukraine for being a gay male, when in fact Danskoi, Greenberg, and Lysyuchenko fully understood that CS-3 was not gay and suffered no such persecution. Mosha did not personally interact with CS-3.

Arrest and Additional Evidence

Mosha and Danskoi were each arrested at their respective homes on or around February 18, 2021. Greenberg was arrested on the same date while vacationing in Breckenridge, Colorado. Lysyuchenko was arrested in Italy and is presently pending extradition. Shcherbyna remains at-large.

During Mosha's arrest, the FBI recovered and conducted consent searches of several of Mosha's phones.[6] The collective searches of those phones revealed, among other things, that Mosha had been engaged in regular communications with both Greenberg and Danskoi about various clients in the years leading up to the defendants' arrests. Mosha and Danskoi discussed helping certain clients obtain employment visas under fraudulent pretenses, including by creating fake leases and staging fake places of employment. Specifically, Mosha and Danskoi communicated regarding at least two shared clients seeking employment visas in the United States, and contemplated profiting by staging offices and fake leases to make it appear to immigration authorities as though these clients had legitimate jobs waiting for them in the United States, when in fact no such jobs existed. Regarding one such client, Danskoi suggested using a particular store that had previously housed a hairdresser's shop ("There is an option in Brighton, there was a hairdresser there before. If [] they haven't rented it out yet."). Danskoi then asked Mosha how much he would be paid for participating in such a scheme, to which Mosha advised that the two could receive hundreds or thousands of dollars.

In separate communications, Mosha cut-and-pasted complaints by apparent Russian America clients that Danskoi was a fraud who was willing to "embellish[] and invent[]" facts in clients' asylum affidavits, to which Mosha warned "Volodya [*i.e.* Vladimir] be more careful." (GX 580-61-T). In another instance, Mosha and Danskoi discussed a client named "Ruslan" who was interested in obtaining a B1 employment visa. Mosha warned that "Its hard to get an employment visa" such that Danskoi should instead "[s]ell him political [asylum]" to which Danskoi responded, "I will sell it."

A search of Mosha's phone also revealed that he was working with other co-conspirators to assist certain aliens from Russia and other CIS nations—who were unable to visit the United States legally—to travel to Mexico and (at times illegally) cross into the United States with the

---

[6] The FBI had also previously surreptitiously searched one of Mosha's phones, pursuant to a judicially authorized warrant, following Mosha's arrival at John F. Kennedy Airport from an international location.

understanding that they would then pay/work with Mosha to seek asylum or other forms of legal status in this country. The Government's investigation also revealed that Mosha frequently helped aliens without legal status in this country open bank accounts on the fraudulent pretense that these individuals lived in the United States (including at addresses actually affiliated with Mosha and Russian America). In certain instances, the bank accounts opened with Mosha's assistance were used to launder criminal proceeds, though it is less clear whether Mosha was aware of the nature of the funds traveling through those accounts.

Other independent records also establish Mosha's longstanding relationship with Danskoi and Russian America, including Russian America corporate bank records held at Bank of America, New York State Department of State records detailing Mosha's and Danskoi's roles as principals in the company, and stamped documents, issued by both the Manhattan and Brooklyn Offices, further establishing a common "Russian America" business practice. The two also maintained a Russian America website in which Mosha's and Danskoi's names and phone numbers were listed. Mosha was a charismatic leader and talented marketer and promotor of himself and Russian America and its various immigration services, with considerable YouTube and social media followings in the community.

The FBI's investigation into Mosha also revealed that he frequently helped Russian America clients and others with no actual legal status in the United States to open bank accounts under false pretenses, including by allowing them to claim, untruthfully, that they were living at residential and business addresses which actually belonged to Mosha or Mosha's associates, or by attaching his own name or personal identifying information to those accounts. At least some of these bank accounts were used to receive and/or launder fraud proceeds.

Separately, Mosha presently stands charged by Information in New York County Supreme Court with two counts of grand larceny in the third degree, in violation of New York Penal Law Section 155.35(1); two counts of identity theft in the first degree, in violation of New York Penal Law Section 1908.80(2); and one count of money laundering, in violation of New York Penal Law Section 470.05(1)(a)(ii)(A). Based on the Government's understanding from conversations with the assigned Assistant District Attorney, in that case, in or around 2018, Mosha, without authorization, used another individual's identity – an employee at Chase Bank – to create a shell company which purportedly provided rain shelters and safe rooms. Not coincidentally, that shell company was purportedly located at 85 Broad Street, New York, New York, which as the Court is aware, is the same location of Russian America's Manhattan Office where Mohsa repeatedly met with CS-1 and CS-2. The creation of the shell company allowed Mosha to obtain point-of-sale machines, which he then used to conduct over $40,000 in unauthorized purchases using others' credit cards. Those stolen proceeds were apparently then laundered through a series of other shell company bank accounts connected to Mosha. Mosha's New York case is next scheduled for June 14, 2023.

Procedural Posture

On October 31, 2022, Mosha entered a plea of guilty to Count One of the Indictment, before the Honorable Barbara C. Moses, United States Magistrate Judge. Count One charged Mosha with a three-object conspiracy, all charged under Title 18, United States Code, Section 371: (1)

conspiracy to defraud the United States; (2) conspiracy to commit immigration fraud under the first paragraph of Title 18, United States Code, Section 1546(a), which among other things, makes it unlawful to knowingly obtain a document as evidence of authorized stay or employment in the United States (such as a Form I-94) knowing it to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained; and (3) conspiracy to commit immigration fraud under the fourth paragraph of Title 18, United States Code, Section 1546(a), which in relevant part, criminalizes making under oath, or under penalty of perjury, subscribing as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder (such as a Form I-589), or knowingly presenting any such application, affidavit, or other document which contains any such false statement.

Pursuant to a plea agreement, the parties stipulated that pursuant to U.S.S.G. § 2L2.1, the base offense level is 11, that pursuant to § 3B1.1 four levels are added because Mosha was the leader of a conspiracy involving five or more participants (and that was otherwise extensive), and that pursuant to § 3E1.1(a) two levels should be reduced for acceptance of responsibility, yielding a stipulated offense level of 13. The parties further stipulated that Mosha had no criminal history points, such that he is in Criminal History Category I, yielding a Stipulated Guidelines Range of 12 to 18 months' imprisonment. As part of his plea, Mosha also agreed to forfeiture in the amount of $9,600. On November 4, 2022, the Court accepted Mosha's plea. (Dkt. No. 167).

In Mosha's sentencing memorandum, he seeks a non-custodial sentence. (Dkt. No. 253). For its part, the United States Probation Department ("Probation") agrees with the parties' assessment of the applicable Guidelines offense level and the defendant's criminal history level, and recommends a Guidelines sentence of one year and one day of imprisonment. (PSR at 35). In reaching this recommendation, Probation observes,

> [F]rom at least August 2018 through February 2021, while operating and being the CEO of an immigration agency, the defendant aided clients in fraudulently seeking asylum in the United States, by preparing and submitting asylum applications, which contained fictitious information. Moreover, Mosha helped fabricate false stories about his client's persecution and coached them for the asylum interviews. Additionally, the defendant arranged to some of his clients to use the assistance of a journalist, a blogger, a translator and attorneys, in order to support fraudulent claims for asylum, i.e., creating fake evidence to support the asylum claims and encourage clients to lie under oath.
>
> . . . .
>
> While we recognize that the defendant is a first-time offender, this has been accounted for within the criminal history computation, and when determining the guideline sentencing range. While we considered a variance under 18 USC 3553(a), due to the defendant's personal history, and are sympathetic to the difficulties he experienced in Russia, as well as the impact incarceration could have on children, we do not believe that a variance is warranted. We note that such issues are not unique to him and seem to be quite common for individuals involved

> with the criminal justice system. The Probation Office believes that a term of imprisonment is appropriate in this case, in light of the fact that Mosha was a leader in the offense, which occurred over a period of several years. Moreover, we cannot overlook the fact that the defendant himself took unfair advantage of an act that was made to help individuals seek safety in the United States and escape true violence and persecution, which he reportedly experienced and ultimately drove him to leave Russia.

(PSR at 35, 37).

## Discussion

### Legal Framework

The Guidelines, while no longer mandatory, still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005). A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," and that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). Although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46. To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

### A Guidelines Sentence is Warranted

Consideration of the factors set forth in 18 U.S.C. § 3553(a) militates in favor of a sentence within the Stipulated Guidelines Range in this case. The nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment warrant a Guidelines sentence. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). Mosha's criminal conduct was significant, contemplated, and sustained. He played a leadership role in a long-lasting conspiracy to defraud USCIS and obtain asylum and visas for individuals who did not deserve it.

The seriousness of Mosha's conduct warrants imprisonment. As the Court is well aware, the asylum system is designed to help the world's most vulnerable people—those who justifiably fear imprisonment, assault, torture, or death, simply because of factors they cannot control, such as their religion, nationality, ethnicity, political views, gender, or sexual orientation. Mosha cynically exploited that system by conspiring to trick USCIS officials into believing that clients who did *not* suffer or fear such inhumanities qualified for asylum. Further, Mosha's immigration

crimes were not limited to asylum fraud; he and Danskoi discussed staging fake offices and lease agreements to help certain aliens obtain employment visas. Moreover, Mosha was not simply a passive participant in the conspiracy. To the contrary, as reflected by his stipulated guidelines, he was a leader, with Danskoi, of the operation. He used his palpable charisma, notable marketing skills, public persona, and YouTube and social media followings to generate business and further the conspiracy. While the Government lacks complete visibility into the scope of Mosha's asylum fraud conspiracy, the evidence makes clear that his conduct was not simply limited to the confidential sources introduced by the investigating agents. Among other things, he encouraged Danskoi to "sell" political asylum, and that is what Russian America did. He helped fabricate false stories about his clients' persecution and coached them for the asylum interviews. He arranged the assistance of numerous others to bolster the fraud, including a "journalist," a blogger, a translator, and attorneys, all in order to support fraudulent claims for asylum that were submitted under oath. And he openly cited to CS-1 at least one other former client "Sergey," for whom Mosha obtained asylum through the very same fake-blogging scheme that Mosha encouraged with CS-1 and CS-2.

Further, Mosha's conduct was not a momentary aberration, it was repeated and long-lasting, as the charged conspiracy spans two-and-a-half years. For CS-1 alone, Mosha made multiple decisions, across several meetings and actions, each of which displayed his willingness to commit and encourage fraud. Over and over again, Mosha took steps to commit fraud with and on behalf of CS-1, including, but not limited to: steering CS-1 toward pursuing asylum without any known legitimate basis; agreeing to prepare an asylum application that was false; cynically advising CS-1 to falsely blog to bolster his claim and defraud USCIS; conducting a mock interview so that CS-1 could lie under oath to asylum officers; and connecting CS-1 with Lysyuchenko, Shcherbyna, and Greenberg, all to further the unlawful conspiracy.

And that was just CS-1. Mosha likewise engaged in a similar agreement to commit immigration fraud with respect to "Sergey," CS-2, and the clients discussed in his messages with Danskoi where Mosha mentioned creating fake leases and staging fake places of employment to get clients visas and encouraged Danskoi to "sell" political asylum.

Mosha of course charged for his services, showing that his crime was motivated by greed. Put simply, there was absolutely no need or justification for Mosha to turn to fraud.

Like many white-collar defendants, Mosha has submitted and quoted from character letters from family members, friends, and others in his social circle, attesting to his positive personal qualities, and expressing surprise at his arrest and conviction. It is, of course, appropriate for the Court to take these letters into account in connection with sentencing. However, the Government asks that, in so doing, the Court consider the following. First, the attestations to Mosha's positive personal qualities do not distinguish him from other similarly situated white-collar defendants—individuals who, despite having many opportunities and a network of people who love and support them, nonetheless choose to commit fraud. As Judge Marrero astutely observed, this collection of letters:

> falls into a pattern advanced by a subset of the white collar criminal. . . . The list of their achievements and virtues is long and impressive. Let us count the ways.

> At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors.

*United States* v. *Regensberg*, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010). Similarly, his civic contributions, while commendable, are not atypical for an educated white-collar offender and do not warrant a downward departure or variance. *See United States* v. *Vrdolyak*, 593 F.3d 676, 682-83 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card" (citation and internal quotation marks omitted)); *United States* v. *Haversat*, 22 F.3d 790, 796 (8th Cir. 1994) (defendant's charitable and volunteer activities did not make him atypical).

Second, the letter writers' attestations to Mosha's positive qualities have diminished value because he has shown an ability to deceive his loved ones about his criminal activities. That is, he appears to have successfully kept those close to him out of the loop for the duration of his fraud. Indeed, even after Mosha's guilty plea, his wife told Probation that she "believes that her husband unknowingly made a mistake and would never intentionally violate the law, adding that as immigrants, they 'do not know the law.'" (PSR ¶ 91). Of course, as Mosha admitted under oath, he knowingly and intentionally violated, and was well aware of, the law.

Third, as discussed above, this is *not* a case where the offense conduct was wildly aberrant or prompted by a brief lapse in judgment and where, as a result, it might be appropriate to give more weight to the defendant's otherwise law-abiding life. Indeed, Mosha committed the charged conduct over a period of years. Further, his criminal conduct does not appear limited to immigration fraud. As discussed above, Mosha has also repeatedly defrauded U.S. financial institutions; created multiple shell companies and shell company bank accounts; stolen money from others; and laundered those funds, and enriched himself, through those accounts.

Accordingly, even crediting the testimonials Mosha has submitted and refers to in connection with sentencing—and the Government does not question their sincerity—the defendant has shown himself, both through the charged immigration fraud conspiracy, but also through the financial frauds cited in this memo and charged by the New York County District Attorney's Office, to be a skilled and sophisticated fraudster who has committed deceitful acts in a variety of ways, across a prolonged span of time, and not someone who deserves any benefit of the doubt with respect to this Court's judgment of his character.

Additionally, Mosha's suggestion that his shame, humiliation, and loss of professional standing as a result of his conviction warrants a lighter sentence should be rejected. Any notion that successful white-collar criminals should be sentenced more lightly than defendants of a lower socioeconomic status cannot be countenanced. "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States* v. *Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) (citing U.S.S.G. § 5H1.2); *see also United States* v. *Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence of one day with credit

for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life. '[N]one of these things are [his] sentence. Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." (citation omitted)); *United States* v. *Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."). As the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States* v. *Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted).

Further, that Mosha coached a client to lie to an Asylum Officer is an aggravating fact. The immigration system depends upon the honesty of its participants. Mosha's crimes undermine the public's faith in the immigration system, elevating the seriousness of this fraud. Likewise, Mosha's conduct was not completely victimless. USCIS reports that immigration fraud, including asylum fraud, is endemic. The overwhelming load of fraudulent applications creates a backlog and delays for those vulnerable applicants who truly deserve the relief asylum provides, and unfortunately causes USCIS to view each asylum application—including for those who legitimately deserve such relief—with a more skeptical eye.

For all of these reasons, Mosha's conduct was serious, and a correspondingly significant sentence is warranted.

As for the immigration consequences of Mosha's conviction and Mosha's concern about being separated from his family and young children, while the Government is of course sympathetic to these important matters, it respectfully notes that the defendant was undeterred from committing his years-long crime despite knowing that it was against the law and bore these considerable risks. As for the immigration consequences, the defendant's logic could conceivably result in the Court treating a citizen who commits the same crime more harshly than the defendant, which both would be unfair and also would run counter to the sentencing command to treat similarly situated defendants similarly. Additionally, that Mosha knew firsthand about violence and persecution abroad yet nonetheless led a business that agreed to commit immigration, visa, and asylum fraud is an aggravator, since Mosha's conduct contributed to delays for those vulnerable applicants who truly deserve asylum relief.

Finally, a Guidelines sentence is necessary for general deterrence purposes, given how lucrative immigration fraud is and how difficult it is to detect and prosecute without time-

consuming audio recordings made during a law enforcement sting operation. Mosha knew that the immigration system was easy to exploit. As a charismatic leader of the fraud, he banked on the fact that immigration fraud can be difficult to identify, investigate, and successfully prosecute.

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Courts have generally recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative." *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997); *see also Harmelin v. Michigan*, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.*; *see also United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (noting district court's comments during an insider trading sentencing that defendant made a "deliberate decision, weighing the risks, that insider trading 'was a game worth playing'" and characterizing "district court's assertion that insider trading requires high sentences to alter that calculus" as "a Congressionally-approved example of giving meaning to the 18 U.S.C. § 3553(a) factors"); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

As stated above, the asylum applicant pool is rife with fraud. The Government's investigation revealed that those in the immigration services industry, including immigration attorneys, are carefully tracking this case and a companion case involving a different immigration fraud conspiracy, *United States v. Dzhamgarova, et al.*, 21 Cr. 58 (MKV). The sentencing decision this Court makes will be similarly followed by the those who represent and advise asylum applicants and prepare asylum applications and affidavits, including those who do so fraudulently. A significant sentence is necessary to send a clear message to those individuals who are currently committing, or contemplating committing such fraud: those who are caught gaming the immigration system will be brought to justice, held accountable, and receive serious and significant punishments for it. The risk of shame, loss of professional status, deportation, and separation from his family clearly did not deter Mosha from his years of fraudulent conduct, but that punishment coupled with a meaningful term of imprisonment will deter others.

Hon. J. Paul Oetken                                                                                                  Page 17
May 26, 2023

## Conclusion

For these reasons, the Government respectfully submits that an incarceratory sentence within the Stipulated Guidelines Range of 12 to 18 months' imprisonment is warranted.[7]

                                        Respectfully submitted,

                                      DAMIAN WILLIAMS
                                      United States Attorney for
                                      the Southern District of New York

                           By:   /s/ David R. Felton
                                David R. Felton
                                Jonathan E. Rebold
                                Assistant United States Attorneys
                                (212) 637-2299 / -2512

cc:  Vadim A. Glozman, Esq. (via ECF)

---

[7] The Government also respectfully requests that during the sentencing proceeding, the Court: (a) orally order forfeiture in the amount of $9,600, as reflected in the previously docketed Consent Preliminary Order of Forfeiture; (b) impose the bottom-of-the-Guidelines $5,500 fine recommended by Probation, (PSR at 35); and (c) include, during any term of supervised release, a special condition that Mosha not be permitted to provide any immigration services to anyone.